UNITED STATES of America

v.

L. Robert FRAME, Sr. and Vintage Sales Stables, Inc., Appellants.

No. 88–1104.

United States Court of Appeals,
Third Circuit.

Argued July 11, 1988.

Decided Sept. 14, 1989.

William H. Mitman, Jr. (argued), West Chester, Pa., for appellants.

Constance A. Wynn (argued), Douglas Letter, Jeffrica J. Lee, U.S. Dept. of Justice, Appellate Staff, Civ. Div., Washington, D.C., for appellee.

Before SLOVITER, SCIRICA and WEIS, Circuit Judges.

OPINION OF THE COURT

SCIRICA, Circuit Judge.

This appeal concerns constitutional and statutory challenges to the Beef Promotion

and Research Act of 1985, 7 U.S.C. §§ 2901–11 (Supp. III, 1985). The Act requires cattle producers and importers to finance a national beef promotional campaign by paying, on each head of cattle sold, a one dollar assessment, which is eventually remitted to statutorily designated organizations composed of industry representatives. The constitutional questions are whether the Act contravenes: (1) the limits of congressional power enumerated in the Federal Constitution; (2) the Free Speech and Association clauses of the First Amendment; or (3) the Takings Clause or Equal Protection guarantee of the Due Process Clause of the Fifth Amendment. The statutory questions are whether the Act: (1) creates a civil cause of action in which the government may recover uncollected assessments from "collecting persons"; or (2) authorizes the government to impose late payment charges. The district court held that the Act violated no constitutional provision, and that the Act authorizes a private cause of action against "collecting persons" for both uncollected payments and late charges. We will affirm.

## I.

## BACKGROUND

### A. *Statutory and Regulatory Scheme*

The Beef Promotion and Research Act, Pub.L. No. 99–198, Title XVI, § 1601, 99 Stat. 1597 (codified as amended at 7 U.S.C. §§ 2901–11), first passed in 1976 and later amended in 1985, was designed to strengthen the beef industry's position in the marketplace through a coordinated program of promotion and research. 7 U.S.C. §§ 2901(b). This legislation was structured as a "self-help" measure that would enable the beef industry to employ its own resources and devise its own strategies to increase beef sales, while simultaneously avoiding the intrusiveness of government regulation and the cost of government "handouts." *See* Report of Committee on Agriculture, Beef Research and Informa-

tion Act, H.R.Rep. No. 452, 94th Cong., 1st Sess. 3 (1975). The Beef Promotion and Research Program receives no direct funding from the federal government, and in this regard resembles a number of recent congressional enactments designed to make various federal regulatory programs partially or entirely self-financing. *See Skinner v. Mid–America Pipeline,* —— U.S. ——, 109 S.Ct. 1726, 1729, 104 L.Ed.2d 250 (1989) (characterizing Section 7005 of Consolidated Omnibus Budget Act of 1985, codified at 42 U.S.C.App. § 1682a, which directs Secretary of Transportation to collect "pipeline safety user fees" to fund administrative costs, as one example of several self-financing measures). Currently in existence are seven other promotion and research programs for agricultural commodities, identical in most respects to the Beef Promotion Act. *See* 7 U.S.C. §§ 2101–18 (1982) (cotton); 7 U.S.C. §§ 2611–27 (1982) (potatoes); 7 U.S.C. §§ 2701–18 (1982) (eggs); 7 U.S.C. §§ 4501–13 (Supp. III 1985) (dairy products); 7 U.S.C. §§ 4601–12 (Supp. III 1985) (honey); 7 U.S.C. §§ 4801–19 (Supp. III 1985) (pork); 7 U.S.C. §§ 4901–16 (Supp. III 1985) (watermelon).[1]

The Beef Promotion Act directs the Secretary of Agriculture to promulgate a Beef Promotion and Research Order that establishes this self-help program and provides for its financing "through assessments on all cattle sold in the United States and on cattle, beef, and beef products imported into the United States." 7 U.S.C. §§ 2901(b), 2903, 2904(8)(A)–(C). The Beef Promotion Act itself, however, establishes the rate of assessment at one dollar ($1.00) per head of cattle, which must be paid by cattle producers and importers. 7 U.S.C. § 2904(8)(C). The Act also specifies most of the other terms that the Order must contain, *see* 7 U.S.C. § 2904(1)–(11), but authorizes the "inclusion of all terms and conditions necessary to effectuate the provision of the order," provided they are not inconsistent with the statute. 7 U.S.C. § 2904(12). After notice and opportunity for public comment, the Beef Promotion

---

**1.** A promotion and research program also exists for wool, but that program does not provide for mandatory assessments. 7 U.S.C. § 1787.

and Research Order became effective on July 18, 1986, 7 C.F.R. §§ 1260.101–.217 (Subpart A), while the rules and regulations for collection of assessments, 7 C.F.R. §§ 1260.301–.316 (Subpart B), and the Certification for the Cattlemen's Beef Promotion and Research Board, 7 C.F.R. §§ 1260.500–.530 (Subpart C), became effective on October 1, 1986.

The Secretary's Order, as the Act mandates, provides for the establishment of a Cattlemen's Beef Promotion and Research Board ("Cattlemen's Board"), and a Beef Promotion Operating Committee ("Operating Committee") to administer the Order under the supervision of the Secretary. The Beef Promotion Act and Order specify the manner in which the membership of the Cattlemen's Board is to be selected. First, the Order divides the United States into forty-two units that correspond primarily to the States. 7 C.F.R. § 1260.141(a). Forty-one of those units represent cattle producers, and one unit represents importers. *Id.* The Order specifies the number of Cattlemen's Board members allocated to each unit. *Id.* "Eligible organizations" representing each unit submit nominations to the Secretary for positions on the Cattlemen's Board. 7 U.S.C. §§ 2904(1), 2905(a); 7 C.F.R. § 1260.143(a). "Eligible organizations" are those existing state cattle organizations certified by the Secretary as meeting criteria specified by the Beef Promotion Act and Order, criteria which include large membership, history of stability, and an "overriding purpose of promoting the economic welfare of cattle producers." 7 U.S.C. § 2905(b); 7 C.F.R. § 1260.530. From these nominations, the Secretary appoints the members of the Board. 7 U.S.C. § 2904(1); 7 C.F.R. § 1260.141(b).

Similarly, the Beef Promotion Act and Order details the selection procedure to fill the twenty positions available on the Operating Committee. The Cattlemen's Board elects from its own ranks ten members to serve on the Committee. 7 U.S.C. § 2904(4)(A); 7 C.F.R. §§ 1260.161. The other ten Committee members are cattle producers who are representatives of the "Federation," which includes as its members "qualified State beef councils." 7 U.S.C. § 2904(4)(A). A "qualified State beef council" is a beef promotion entity that is authorized by state statute, or a beef promotion entity that receives voluntary assessments or contributions from cattle producers; in either case, that entity is not "qualified" unless certified by the Cattlemen's Board. 7 C.F.R. § 1260.115. Federation representatives on the Committee consist of the Federation chairperson and vice-chairperson, and eight elected cattle producers who are members of the Federation Board of Directors, and are members or ex officio members of the Board of Directors of a Qualified State beef council. 7 C.F.R. § 1260.161(c). The Secretary must certify that the Federation representatives meet the above criteria and that they have sufficiently disclosed any contractual relationship between the Federation representative and the Committee or Board. 7 U.S.C. § 2904(4)(A); 7 C.F.R. § 1260.161(c).

Under the supervision of the Secretary, who must finally approve all budgets, plans, expenditures, and contracts for them to become effective, 7 U.S.C. §§ 2904(4)(C) & (6)(A), (B), the Operating Committee and the Cattlemen's Board take the initiative in implementing the program. The Operating Committee has the responsibility for developing plans and projects of promotion and advertising, and of submitting to the Board, for its approval, budgets for the fiscal year. 7 U.S.C. § 2904(4)(A)–(C); 7 C.F.R. § 1260.168(b), (d), (e). The Operating Committee is also authorized to enter into contracts with established national nonprofit industry-governed organizations, including the Federation, to implement the Beef Promotion Act. 7 U.S.C. § 2904(6); 7 C.F.R. § 1260.168(f). The powers and duties of the Cattlemen's Board, delineated by the Beef Promotion Act, include the power to: (A) administer the order; (B) make rules and regulations to effectuate the terms and provisions of the Order; (C) elect members to serve on the Operating Committee; and (D) approve or disapprove budgets submitted by the Committee. 7 U.S.C. § 2904(2)(A)–(D).

Cattle producers and importers are required to pay an assessment of one dollar ($1.00) per head of cattle. 7 U.S.C. § 2904(8)(C); 7 C.F.R. § 1260.172(a)(1). In calculating the amount of assessment due, producers receive partial credit from the Cattlemen's Board for contributions to a qualified State beef council. 7 U.S.C. § 2904(8)(A); 7 C.F.R. §§ 1260.172(a)(3). Each person making payment to a producer for cattle purchased is designated a "collecting person," 7 C.F.R. § 1260.311(a), and is required to collect a per-head assessment and remit the assessments either to the qualified State beef council (which in turn remits the money to the Board), or if no such council exists in that State, directly to the Cattlemen's Board. 7 U.S.C. § 2904(8)(A); 7 C.F.R. §§ 1260.172(a)(5), 1260.311(a), 1260.312(c). All "collecting persons" are obligated to maintain records of assessments collected and payments made pursuant to the Beef Promotion Act, and must make these records available to the Secretary for inspection. 7 U.S.C. 2904(11); 7 C.F.R. § 1260.202. The Order further requires collecting persons to report to the Board specific information for each calendar month at the time assessments are remitted. 7 C.F.R. § 1260.312(a)–(c). The Act does not provide for reimbursement for such expenditures. By regulation, collecting persons must remit assessments not later than the 15th day of the month following the month in which the assessments were collected. 7 C.F.R. §§ 1260.172(a), 1260.312(c). The Order also provides that any overdue assessments will be increased by 2% each month, beginning the date after the assessments were due. 7 C.F.R. § 1260.175.

The Secretary is authorized to make investigations to uncover current, past, or future violation of the Beef Promotion Act and/or Order. 7 U.S.C. § 2909. Pursuant to this investigation, the Secretary has been given the power to administer oath and affirmation, to subpoena both witnesses and records, and to invoke the aid of the courts if the subpoenas are ignored. *Id.* In addition, the Act contains two specific enforcement mechanisms. The Secretary may, after an administrative hearing, issue an order to restrain or prevent a person from violating the Beef Order, and assess a civil penalty of up to $5,000 for a violation already committed. 7 U.S.C. 2908(a)(1) & (2). Alternatively, the Secretary may request that the Attorney General initiate a civil action to enforce, and to prevent and restrain a person from violating, any order or regulation promulgated by the Secretary under the Act. 7 U.S.C. § 2908(b) & (c).

Within twenty-two months of the issuance of the Order, the Secretary was required to conduct a referendum among those persons who were producers and importers during the trial period. 7 U.S.C. § 2906(a). The Order would continue to operate only upon the approval by a majority of those participating in the referendum. *Id.* Prior to the referendum, any cattle producer who paid an assessment and who was not in favor of supporting the promotion and research program, could have demanded and received a full refund of the assessments paid. 7 U.S.C. § 2907; 7 C.F.R. §§ 1260.173, 1260.174. On May 10, 1988, the referendum was conducted and the Order was approved by 70% of those eligible to vote. Assessments, therefore, are now mandatory.

## B. *Factual and Procedural History*

The facts are undisputed. The defendant-appellant L. Robert Frame, Sr. operates Vintage Sales Stables ("Vintage"), a cattle auction sales business in Lancaster County, Pennsylvania. Frame also raises cattle at his residence in Chester County, Pennsylvania. Consequently, under the Act, Frame qualifies as both a "collecting person" and a producer; he must collect the $1.00 per head of cattle assessments from the proceeds derived from the sale of cattle at his auction barn and pay the assessments on each head of cattle he sells as a producer. Since the effective date of the Beef Promotion Act, Frame has neither collected nor remitted the required assessments, nor filed the required reports, despite having received several warnings about his noncompliance from the Pennsyl-

vania Beef Council,[2] the Cattlemen's Board, and the Department of Agriculture, Livestock and Seed Division.

In November, 1986, the United States brought an action in the district court to recover money due from Vintage and Frame, as president of Vintage, for Frame's failure to fulfill his obligations as a collecting person under the Beef Promotion Act and Order, i.e., to collect assessments on beef sold, remit those funds to the qualified State beef council, and maintain records of those collections.[3] Frame did not dispute that he had failed to comply with the Beef Promotion Act. Instead, he asserted that the Beef Promotion Act is unconstitutional, and that the Act failed to confer upon the government the right to commence a civil action against collecting persons to recover uncollected assessments. Frame requested that the court enjoin the collection of assessments and the use of collected funds, and mandate the return of the funds not yet expended.

After both parties moved for summary judgment, the district court granted the government's motion for partial summary judgment on the issue of liability. *United States v. Frame*, 658 F.Supp. 1476 (E.D.Pa. 1987). The court thereafter ordered defendant to file all reports required by the Act within a reasonable period and to provide the Secretary of Agriculture with such materials reasonably required to determine the amount of liability under the Act. After defendant complied with the court's order, the government moved for summary judgment on the amount of liability. Defendant then renewed his motion for summary judgment, arguing that the Act did not authorize the government to recover uncollected assessments from defendant as a "collecting person," or to impose late payment charges. The district court granted the government's motion for summary

judgment and entered judgment against defendant totalling $66,625.11 in uncollected assessments and late payment charges. This appeal followed.

## II. LACK OF CONGRESSIONAL AUTHORITY AND UNCONSTITUTIONAL DELEGATION

Frame has maintained throughout this litigation that none of the enumerated powers in Article I of the United States Constitution confer upon Congress the authority to establish the sort of program instituted by the Beef Promotion Act. Following oral argument, we directed the parties to submit supplemental briefs discussing Congress' authority to delegate to the members of industry: (1) the prerogative, through a referendum, to decide whether to put the program into effect; and (2) the responsibility for the collection of assessments and the decision as to precisely how the funds will be spent. We will address these issues in turn.

### A. *The Commerce Power*

■ The parties now agree that in enacting the Beef Promotion Act, Congress presumed that it was exercising its power under the Commerce Clause.[4] The Act's finding that "beef and beef products move in interstate and foreign commerce," or "directly burden or affect interstate commerce of beef and beef products," 7 U.S.C. § 2901(a), reflects this intent. The question before us, therefore, is whether this Act is a valid regulation under the commerce clause. In finding for the government, the district court held that the promotion of beef represents a valid exercise of Congress' "broad" power to "stimulate" interstate commerce. 658 F.Supp. at 1482. We agree.

---

**2.** The Pennsylvania Beef Council, Inc., has been certified by the Cattlemen's Board as a qualified State beef council to collect beef promotion assessments in Pennsylvania. 7 C.F.R. § 1260.315(dd).

**3.** Although Frame is also a producer, the government did not sue him in his capacity as such. *See* App. at 9.

**4.** At oral argument before this court, defendant's counsel explained that at earlier stages in the litigation defendant had argued that the assessments on beef constituted a "tax," *see United States v. Frame*, 658 F.Supp. at 1479, but has abandoned that claim on appeal.

It is well settled that Congress will have validly exercised its power to regulate interstate commerce if the activity being regulated affects commerce, and if there is a rational connection between the regulatory means selected and the asserted ends. *See Katzenbach v. McClung,* 379 U.S. 294, 301, 303–04, 85 S.Ct. 377, 383–84, 13 L.Ed.2d 290 (1964); *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981). Furthermore, a reviewing court need only inquire whether there is a rational basis for the finding that the regulated activity affects interstate commerce. *Hodel,* 452 U.S. at 276, 101 S.Ct. at 2360. Similarly, it is now indisputable that the power to regulate interstate commerce includes the power to promote interstate commerce. *See Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 258, 85 S.Ct. 348, 358, 13 L.Ed.2d 258 (1964) (upholding congressional decision to "promote" interstate commerce by eradicating discriminatory practices that "obstruct" channels of commerce). "The stimulation of commerce is a use of the regulatory function quite as definitely as prohibitions or restrictions therein." *Wickard v. Filburn,* 317 U.S. 111, 128, 63 S.Ct. 82, 91, 87 L.Ed. 122 (1942).

Defendant does not challenge the rationality of the congressional finding that beef moves through interstate commerce and has a substantial effect on interstate commerce. Instead, defendant disputes that the Act is "regulatory" at all. He asserts that Congress has "created a trade association which is designed to benefit private industry," which "exceeds any grant of regulatory power to Congress." We disagree. Congress established the Beef Promotion and Research Program to "strengthen and expand" the nation's beef

markets. A regulation of commerce includes a congressional attempt to bolster the public image of a product in order to increase consumer demand. In the past, Congress has permissibly regulated commerce by influencing the supply side of agricultural markets by using devices such as production quotas, *see Wickard v. Filburn,* 317 U.S. at 128, 63 S.Ct. at 90 (Congress may have properly considered that wheat consumed on the farm where grown, if wholly outside the scheme of regulation, would have a substantial effect in defeating and obstructing its purpose to stimulate trade therein at increased prices), low-interest loans to producers, *see* 7 U.S.C. § 1447, and subsidies dictated by the federal government, *see United States v. Rock Royal Co-Op.,* 307 U.S. 533, 554–55, 59 S.Ct. 993, 1004–05, 83 L.Ed. 1446 (1939) (Order No. 27 of Agricultural Marketing Agreement Act of 1937 permissibly required milk "handlers" to pay into producer settlement fund difference between minimum price and "uniform price" so that producers in all areas receive uniform price). Congress has, in addition, "stabilized" interstate commerce using direct price controls. *See Sunshine Anthracite Coal Co. v. Adkins,* 310 U.S. 381, 393–94, 60 S.Ct. 907, 912–13, 84 L.Ed. 1263 (1940). Congress has also stimulated the demand side of agricultural markets by creating demand in the form of direct government purchases. *See* 7 U.S.C. § 1447 (Supp. I 1983) (authorizing Secretary of Agriculture to purchase from producers agricultural commodities not in excess of 90% of the parity price). In enacting the Beef Promotion Act, Congress has chosen to "promote" and "stimulate" the demand side of the market indirectly, by influencing consumer attitudes towards beef.[5] That this

---

**5.** The dissent asserts that the Beef Promotion Act does not conform to the "accepted meaning" of the term "to regulate." *See* dissent op. typescript at 2 (citing *Webster's Third International Dictionary* 1913 (1973)) ("regulate: ... 1: to govern or direct according to rule ... 2a: to reduce to order, method, or uniformity ... 3: to fix the time, amount, degree, or rate of."). We believe, however, that the accepted legal definition of the term "regulate" is more inclusive than the commonplace definition:

Regulate. To fix, establish, or control: to adjust by rule, method, or established mode.... The power of Congress to regulate commerce is the power to enact all appropriate legislation for its protection or advancement; to adopt measures to promote its growth and insure its safety; to foster, protect, control, and restrain.

*See Black's Law Dictionary* 1156 (5th ed. 1979) (citations omitted). Therefore, we employ the specialized, rather than the everyday definition

is an "indirect" rather than a "direct" form of regulation does not, by itself, render it invalid. The distinction between "indirect" and "direct" regulations of commerce, once at the core of commerce clause analysis, *see, e.g., Carter v. Carter Coal,* 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936) (legislation regulating maximum wages and minimum hours in coal mines invalid as it regulates production, which has only an "indirect" effect on commerce), has long been discredited, *see Wickard v. Filburn,* 317 U.S. at 128, 63 S.Ct. at 90.

■ As part of its power to regulate interstate commerce, Congress may also regulate "activities" affecting commerce. *See Katzenbach v. McClung,* 379 U.S. at 301, 303–04, 85 S.Ct. at 382, 383–84. *Accord Hodel v. Virginia Surface Mining,* 452 U.S. at 276, 101 S.Ct. at 2360. In urging that the Beef Promotion Act is unconstitutional, defendant claims that no "activity" is being regulated. We disagree. Implicit in Frame's argument is the fallacy that Congress must particularize the activity being regulated. Not only has Frame failed to cite a case where courts have invalidated an act of Congress because of its failure to specify the "activity" being regulated, the case law suggests that such specification is unnecessary. In upholding Title II of the Civil Rights Act of 1964, the Supreme Court characterized the "activity" being regulated as "interstate travel," "public accommodations," and "discriminatory practices," thus implicitly suggesting that Congress need not identify with particularity the "activity" being regulated. *See Heart of Atlanta Motel,* 379 U.S. at 251–53, 85 S.Ct. at 354–55. Likewise, we decline to invalidate an otherwise lawful exercise of the commerce power on the basis Congress has not specified whether it is regulating the "activity" of "consumer beef purchases," "interstate beef sales," or "national beef markets." Each activity is related, and is validly regulated by Congress.

Our only remaining inquiry is whether there is a rational connection between the regulatory means selected and the asserted ends. *See Hodel v. Virginia Surface Mining,* 452 U.S. at 276, 101 S.Ct. at 2360; *see also Heart of Atlanta Motel,* 379 U.S. at 261, 85 S.Ct. at 359 ("How obstructions in commerce may be removed—what means are to be employed—is within the sound and exclusive discretion of Congress."). To stimulate the demand for beef, the lack of which Congress has determined is harming the beef industry, Congress has chosen from its arsenal of regulatory means promotion and advertising, research, consumer information and industry information. These endeavors are rationally related to the maintenance and expansion of the nation's beef markets. Consequently, we hold that the Beef Promotion Act is a valid exercise of congressional power to regulate interstate commerce.

## B. *Validity of Referendum Provision*

■ The Beef Promotion Act provision calling for an industry referendum following a period in which the promotional order was in effect, 7 U.S.C. § 2906(a), is almost identical to other referendum provisions that have been approved by the Supreme Court. As the Court held in *Currin v. Wallace,* 306 U.S. 1, 15, 59 S.Ct. 379, 386, 83 L.Ed. 441 (1939), an industry referendum "does not involve any delegation of legislative authority." In upholding the statute at issue in *Currin,* which provided that restrictions upon the marketing of tobacco were to become effective only upon a favorable vote by two-thirds of the growers, the Court explained that

> Congress ... [had] exercise[d] its legislative authority in making the regulation and in prescribing the conditions of its application. The required favorable vote upon the referendum was one of those provisions.

*Id.* at 16, 59 S.Ct. at 387. *Accord Wickard v. Filburn,* 317 U.S. at 117–18, 63 S.Ct. at 85–86 (upheld validity of referendum of wheat farmers conducted pursuant to Agri-

---

of this term. *Cf. Holof v. Commissioner,* 872 F.2d 50, 55 (3d Cir., 1989) (citing *Mellon Bank, N.A. v. Aetna Business Credit,* 619 F.2d 1001,

1013 (3d Cir.1980) (legal terms of art should be interpreted in accordance with their specialized usage)).

cultural Adjustment Act of 1938); *United States v. Rock Royal Co-op.*, 307 U.S. at 577, 59 S.Ct. at 1014 (upheld referendum provision of Agricultural Marketing Agreement Act). *See also Parker v. Brown,* 317 U.S. 341, 352, 63 S.Ct. 307, 314, 87 L.Ed. 315 (1943) (reasoning that law which became effective only on a majority vote of producers was exercise of legislative power by the state, not by producers). Accordingly, we hold that the referendum provision here, exercised pursuant to Congress' commerce power, is a valid condition upon the application of the Beef Promotion Act and not an unlawful delegation of power.

C. *Assessment Collection and Spending Proposals by Cattlemen's Board*

██ It is plain that the Beef Act does not unlawfully delegate legislative authority to the Secretary. "So long as Congress provides an administrative agency with standards guiding its action such that a court could ascertain whether the will of Congress had been obeyed, no delegation of legislative power has occurred." *Skinner v. Mid–America Pipeline,* —— U.S. ——, 109 S.Ct. 1726, 1731, 104 L.Ed.2d 250 (citing *Mistretta v. United States,* —— U.S. ——, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989)). In the Beef Promotion Act, Congress has done more than provide standards for the administration of the Act; it has set forth with unusual specificity the terms of the Act's implementation. Most importantly, Congress itself has set the amount of assessments at $1.00 per head of cattle, 7 U.S.C. § 2904(8)(C). Similarly, Congress has provided detailed procedures for determining the membership of the Cattlemen's Board and the Operating Committee. *See* 7 U.S.C. § 2904(4)(A). In sum, under the Beef Promotion Act, Congress has delegated to the Secretary far less discretion than the Supreme Court has previously sanctioned in applying the non-delegation doctrine. *See Skinner v. Mid–America Pipeline,* 109 S.Ct. at 1731 (citing *Lichter v. United States,* 334 U.S. 742, 778–86, 68 S.Ct. 1294, 1313–17, 92 L.Ed. 1694 (1948)) (upholding delegation of authority to War Department to recover "excessive profits" earned on military contracts); *Yakus v.*

*United States,* 321 U.S. 414, 420, 426–27, 64 S.Ct. 660, 665, 668–69, 88 L.Ed. 834 (1944) (upholding delegation of authority to the Price Administrator to fix prices of commodities that "will be generally fair and equitable and will effectuate the purposes" of the congressional enactment); *FCC v. Hope Natural Gas Co.,* 320 U.S. 591, 600–01, 64 S.Ct. 281, 286–87, 88 L.Ed. 333 (1944) (upholding delegation to Federal Power Commission to determine "just and reasonable" rates)).

Nor has Congress unlawfully delegated its legislative authority to members of the beef industry merely because the Cattlemen's Board is authorized to collect assessments and to take the initiative in planning how those funds will be spent. In *Sunshine Anthracite Coal Co. v. Adkins,* 310 U.S. 381, 60 S.Ct. 907, the Supreme Court upheld a provision of the Bituminous Coal Act of 1937 that assigned a similar function to members of the coal industry. Under that Act, coal producers were organized under the Bituminous Coal Code and authorized to fix minimum prices for code members in accordance with stated standards. *Id.* at 388, 60 S.Ct. at 910. The prices set by the Code became effective upon approval or modification of the National Bituminous Coal Commission, the government agency charged with administering the Act. *Id.* In upholding the Act against the challenge that Congress had unlawfully delegated legislative authority to members of the coal industry, the Court stated:

> The members of the code function subordinately to the Commission. [The Commission] not the code authorities, determines the prices. And it has authority and surveillance over the activities of these authorities. Since law-making is not entrusted to the industry, this statutory scheme is unquestionably valid.

*Id.* at 399, 60 S.Ct. at 915.

Applying this standard to the Beef Promotion Act, we find that the amount of government oversight of the program is considerable, and conclude that no lawmaking authority has been entrusted to the members of the beef industry. Both the Act and the Order render the actions of the

Cattlemen's Board subject to the Secretary's pervasive surveillance and authority. Board members are appointed by the Secretary, 7 U.S.C. § 2904(1); 7 C.F.R. § 1260.141(b), while members of both the Board and the Operating Committee may be removed "if the Secretary determines that the person's continued service would be detrimental to the purposes of the Act." 7 C.F.R. § 1260.212. The Board, as well as the Operating Committee, must give the Secretary notice of its meetings "in order that the Secretary or his representative may attend such meetings." 7 C.F.R. §§ 1260.150(m), 1260.169(h). In addition, the Board and the Committee are required to prepare an annual report to be made public, 7 C.F.R. §§ 1260.150(k), 1260.169(g), and the Board is required to submit to the Secretary for each fiscal period an audit of its activities, 7 C.F.R. § 1260.150(*l*). Furthermore, all budgets, plans or projects approved by the Board become effective only upon final approval by the Secretary. 7 U.S.C. § 2904(4)(C). Similarly, no contracts for the implementation of any plans may be entered into without the Secretary's approval. 7 U.S.C. §§ 2904(6)(A) & (B); 7 C.F.R. §§ 1260.150(f) & (g), 1260.-168(e) & (f).

Therefore, we hold that the Beef Promotion Act does not constitute an unlawful delegation of legislative authority. In essence, the Cattlemen's Board and the Operating Committee serve an advisory function, and in the case of collection of assessments, a ministerial one. Congress itself has set the amount of the assessments, while ultimately, it is the Secretary who decides how the funds will be spent.

## III. THE FIRST AMENDMENT

Relying primarily on *Abood v. Detroit Bd. of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), Frame argues that the Beef Promotion Act violates his rights of free association and free speech under the First Amendment. More specifi-

cally, Frame asserts that his associational rights are violated because:

> The [Beef Promotion Board] is engaging in a nationwide media campaign designed to increase the national consumption of beef, and beef products. The Appellants have no desire to participate in this program, disagree with its message and methods, and want no part of any association, express or implied[,] with this government created trade association.[6]

Similarly, Frame asserts that the Act breaches his constitutional right to refrain from speaking, because it compels him to participate administratively and financially in the promotion of a cause (an advertising campaign "to strengthen and preserve the position of beef and beef products in the marketplace") and a message (the consumption of beef is "desirable, healthy, nutritious") with which he disagrees.

The district court determined that defendant's first amendment rights had been neither burdened nor violated. The court reasoned that the speech authorized and funded by the Act was "government speech," which does not coerce the private individual to endorse an ideological position, but merely communicates the viewpoint of the federal government. 658 F.Supp. at 1482. The government, the court concluded, is "using defendants' money to erect its own billboard." *Id.* The district court noted the policy considerations supporting its decision:

> Many citizens may disagree with the government's position on controversial issues. The first amendment stands ready to protect their right to voice their disagreement. However, it would indeed be a strange result to invoke the same amendment to limit the right of the government to express its views by requiring that the government allow any individual who disagrees with government speech to opt out of his obligation to contribute to the cost.

*Id.* Similarly, the district court reasoned that the First Amendment confers upon

---

6. In his answer and counterclaim, Frame also complains of coerced association with The Beef Industry and "various state Beef Councils."

citizens no "right to refuse to 'associate' with a government program." Accordingly, the court held the Act "required [Frame] to 'associate' with the Beef Promotion Program no more than any taxpayer is required to associate with armed forces advertisements, Social Security, or the Voice of America." *Id.*[7]

## A. *Free Speech and Association and "Government Speech"*

While the First Amendment on its face protects neither the right of association, nor the right to refrain from speech or association, our jurisprudence has plainly established such rights. The Supreme Court has declared that the right of an individual to engage in activities protected by the First Amendment—speech, assembly, petition for redress of grievances and the exercise of religion—encompasses the corresponding right to "associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. United States Jaycees,* 468 U.S. 609, 618, 622, 104 S.Ct. 3244, 3250, 3252, 82 L.Ed.2d 462 (1984) (state statute banning gender discrimination in public clubs implicated members associational rights). This right of "freedom of expressive association," *see id.* at 618, 104 S.Ct. at 3250, has been held to "presuppose a right not to associate." *Id.* at 623, 104 S.Ct. at 3252. In a parallel line of cases, the Supreme Court has held that the First Amendment encompasses a constitutional right to "refrain from speaking." *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (state may not require dissenting citizen to bear state slogan, "Live Free or Die," on automobile license-plate). The seminal case announcing this right was *West Virginia State Bd. of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), in which the Court held that school children with religious objections to the flag saluting ceremony have the constitutional right to be free from "compulsion ... to declare a belief." *Id.* at 633, 63 S.Ct. at 1183.

Compelled contributions to private groups engaging in first amendment activities have been held to implicate these two aspects of first amendment liberty. In *Abood v. Detroit Bd. of Education,* 431 U.S. 209, 97 S.Ct. 1782, the Supreme Court recognized that state laws authorizing unions and management to enter into "agency shop" agreements, which require that every employee, as a condition of employment, pay the union a service charge equal in amount to union dues, impinge upon the employee's right to be free from both compelled affirmation of belief and from compelled association for expressive purposes. *Id.* at 222, 97 S.Ct. at 1792 (reaffirming prior decisions that agency shop agreements themselves justified by compelling state interests in industrial harmony). Thereafter, in *Galda v. Rutgers,* 772 F.2d 1060, 1066 (3d Cir.1985) (*Galda II*), *cert. denied,* 475 U.S. 1065, 106 S.Ct. 1375, 89 L.Ed.2d 602 (1986), this court held that a state university's funding mechanism which required every student to contribute to an independent, outside, non-profit corporation that engages in research, lobbying, and litigation for social change, violated the first amendment rights of dissenting students, as those rights were articulated in *Abood.*[8] *See also Galda v. Bloustein,* 686 F.2d 159, 163 (3d Cir.) (1982) (*Galda I*) (without compelling state interest, refund

---

7. The government had also argued to the district court that Frame was not "forced" to contribute to the Beef Promotion and Research Program because the Act had contained a refund provision in the Act that permitted a dissenting cattle producer who paid an assessment during the period before the industry referendum to demand a refund. 7 U.S.C. § 2907. After the industry referendum on May 10, 1988 approved the Beef Promotion and Research Program, the assessments became mandatory.

8. After *Abood,* it appears that compelled payment without compelled membership, implicates the right of non-association. *Compare Abood,* 431 U.S. at 217 n. 10, 97 S.Ct. at 1790 n. 10 (Court did not find it relevant that the "agency-shop" agreement, unlike the "union-shop" agreement, required only the payment of dues, not formal membership) *with Lathrop v. Donohue,* 367 U.S. 820, 843, 81 S.Ct. 1826, 1838, 6 L.Ed.2d 1191 (1961) (associational infringement slight as membership in integrated bar association limited to the compulsory payment of dues).

mechanism alone failed to remedy constitutional impingement).[9]

■ As an initial matter, we note that "freedom of association," while protecting the rights of citizens to engage in "expressive" or "intimate" association, does not protect every form of association. *See City of Dallas v. Stanglin,* — U.S. —, 109 S.Ct. 1591, 1595, 104 L.Ed.2d 18 (1989) (activity of dance hall patrons, as "social association," not encompassed in constitutional associational rights). Therefore, we find that the aspect of the Beef Promotion Act which imposes the assessments for research purposes qualifies as neither "expressive" nor "intimate" association, and therefore does not implicate Frame's first amendment rights.

■ The government maintains that citizens do not have the right to refuse to support financially government programs with which they disagree, even if that program involves expressive association. In addition to advocating the rationale adopted by the district court, the government also relies on a footnote in Justice Powell's concurrence in *Abood,* which cautioned that "[c]ompelled support of a private association is fundamentally different from compelled support of government." 431 U.S. at 259 n. 13, 97 S.Ct. at 1811–12 n. 13 (Powell, J., concurring). Accordingly, the government views the Cattlemen's Board and the Operating Committee as government entities, stressing that they were created pursuant to a federal statute and are closely supervised by the Secretary.

Justice Powell wrote in *Abood:*

Compelled support of private association is fundamentally different from compelled support of government. Clearly, a local school board does not need to demonstrate a compelling state interest ev-

ery time it spends a taxpayer's money in ways the taxpayer finds abhorrent. But the reason for permitting the government to compel the payment of taxes and to spend money on controversial projects is that the government is representative of the people. The same cannot be said of a union, which is representative only of one segment of the population, with certain common interests. The withholding of financial support is fully protected speech in this context.

*Abood,* 431 U.S. at 259 n. 13, 97 S.Ct. at 1811–12 n. 13. We find merit in this argument. Citizens' tax dollars purchase a considerable amount of "government speech." Not only does the government speak on behalf of its citizens when it airs advertisements warning of the dangers of cigarette smoking or drug use, praising a career in the armed services, or offering methods for AIDS prevention, each time the President of the United States meets with a foreign dignitary, or state department officials enter into arms control negotiations, the government is engaging in expressive activities on behalf of everyone. Indeed, citizens of a country with a representative form of government have agreed to elect individuals to official posts who will, and must, speak and act on behalf of the entire population, including on behalf of those who disagree with all or some of the government's programs.

■ The district court and the government have set forth sound reasons for concluding that the expressive activities financed by the Beef Promotion Act constitute "government speech." The Cattlemen's Board and the Operating Committee, the argument goes, are merely instrumentalities created to enable the Secretary of Agriculture to communicate his message that beef is good. As we have previously

---

**9.** After this court's *Galda I* decision, the Supreme Court invalidated the rebate scheme employed by unions spending union dues for political expenditures, which is invalid under the National Railway Act. *Ellis Brotherhood of Ry, Airline, & Steamship Clerks,* 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984). The Court held that the temporary exaction of this money amounted to an involuntary loan, which mere

administrative ease failed to justify. *Id.* at 443–44, 104 S.Ct. at 1889–90. Therefore, we note but do not find dispositive the fact that five of the agricultural programs resembling the Beef Act provide rebates to dissenting producers. *See* 7 U.S.C. § 2110 (cotton); 7 U.S.C. § 4906(h) (watermelon); 7 U.S.C. § 2712 (eggs); 7 U.S.C. § 2617(g) (potatos); 7 U.S.C. § 4608(h) (honey).

noted, the connection between these entities and the Secretary is a close one. The Board and Committee members serve at the pleasure of the Secretary of Agriculture: Cattlemen's Board members are appointed by the Secretary, 7 U.S.C. § 2904(1); 7 C.F.R. § 1260.141(b), while members of both the Board and the Operating Committee may be removed "if the Secretary determines that the person's continued service would be detrimental to the purposes of the Act," 7 C.F.R. § 1260.212. Moreover, the Secretary makes the final decisions on all projects funded under the Act. All budgets, plans or projects approved by the Board become effective only upon final approval by the Secretary, 7 U.S.C. § 2904(4)(C), and no contracts for the implementation of any plans may be entered into without the Secretary's approval, 7 U.S.C. §§ 2904(6)(A) & (B); 7 C.F.R. §§ 1260.150(f) & (g), 1260.168(e) & (f). Thus, when the Board or Committee "speaks," they do so on behalf of the Secretary of Agriculture and the government of the United States.

Nevertheless, though we find the issue a close one, the underlying rationale of the right to be free from compelled speech or association leads us to conclude that the compelled expressive activities mandated by the Beef Promotion Act are not properly characterized as "government speech." [10] Justice Powell's *Abood* concurrence sought to ensure that "a local school board need not demonstrate a compelling state interest every time it spends a taxpayer's money in ways the taxpayer finds abhorrent." 431 U.S. at 259 n. 13, 97 S.Ct. at 1811–12 n. 13. This attempt to cabin the *Abood* decision echoed prior sentiments that recognition of a broad right against compelled association and belief might obstruct normal governmental functions. In *Wooley v. Maynard*, for example, the Court determined that

coerced bearing of the state slogan on one's car violated freedom of belief, but apparently acquiesced to the dissent's observation that the state was free to tax all citizens for erection and maintenance of billboards bearing state motto "Live Free or Die," *see id.*, 430 U.S. at 721, 97 S.Ct. at 1438 (Rehnquist, J., dissenting). *See also Lathrop v. Donohue*, 367 U.S. 820, 860, 81 S.Ct. 1826, 1847, 6 L.Ed.2d 1191 (1961) (Harlan, J., concurring) (analogizing invalidity of lawyer's first amendment challenge to state integrated bar association to taxpayer's objection to use of tax funds for school textbooks or instruction that the taxpayer finds intellectually repulsive).

These situations, we believe, are distinguishable from the case now before us. Both the right to be free from compelled expressive association and the right to be free from compelled affirmation of belief presuppose a coerced nexus between the individual and the specific expressive activity. When the government allocates money from the general tax fund to controversial projects or expressive activities, the nexus between the message and the individual is attenuated. *See Wooley v. Maynard*, 430 U.S. at 721, 97 S.Ct. at 1438 (Rehnquist, J., dissenting). In contrast, where the government requires a publicly identified group to contribute to a fund earmarked for the dissemination of a particular message associated with that group, the government has directly focused its coercive power for expressive purposes. *Cf. Galda I*, 686 F.2d at 165 (distinguishing standard "student activity fee" from PIRG funding system, as PIRG fee is segregated from other charges on students' bill and provides support for only one organization). This sort of funding scheme, with its close nexus between the individual and the message funded, more closely resembles the *Abood* situation, where the unions, as exclusive

---

**10.** We also note the debate over whether and to what extent the First Amendment constrains government speech. *See generally,* L. Tribe, *American Constitutional Law,* § 12–4 at 807–812 (2d ed., 1988) (First Amendment right against compelled speech or association does not prevent the government from adding its own voice to the many that it must tolerate, provided that it does not drown out private communication).

*Compare, Block v. Meese,* 793 F.2d 1303, 1314 (D.C.Cir.1986) (Scalia, J.) (First Amendment does not constrain government expression of political views) *with* S. Shiffrin, *Government Speech,* 27 U.C.L.A. L.Rev. 565, 590–01 (1980) (author attempts to identify principle beyond mere financial compulsion to determine when government speech might violate First Amendment).

bargaining agents, served as the locutors for a distinguishable segment of the population, i.e., the employees, or the *Wooley* case, where the state "require[d] an individual to participate in the dissemination of an ideological message by displaying it on his property in a manner and for the express purpose that it be observed and read by the public," 430 U.S. at 713, 97 S.Ct. at 1434, regardless of whether the state-issued license plates constituted "government speech." [11]

Furthermore, Justice Powell's justification for distinguishing compelled support of government from support of a private association does not fit comfortably with a "self-help" measure like the Beef Promotion Act. According to Justice Powell,

the reason for permitting the government to compel the payment of taxes and to spend money on controversial projects is that the government is representative of the people. The same cannot be said of a union, which is representative only of one segment of the population, with certain common interests.

431 U.S. at 259 n. 13, 97 S.Ct. at 1811–12 n. 13. The Cattlemen's Board seems to be an entity "representative of one segment of the population, with certain common interests." Members of the Cattlemen's Board and the Operating Committee, though appointed by the Secretary, are not government officials, but rather, individuals from the private sector. The pool of nominees from which the Secretary selects Board members, moreover, are determined by private beef industry organizations from the various states. Furthermore, the State organizations eligible to participate in Board nominations are those that "have a history of stability and permanency," and whose "primary or overriding purpose is to promote the economic welfare of cattle produc-

ers." 7 U.S.C. § 2905(b)(3) & (4). Therefore, we believe that although the Secretary's extensive supervision passes muster under the non-delegation doctrine, it does not transform this self-help program for the beef industry into "government speech."

### B. *Constitutionality of these Incursions on First Amendment Rights*

■ A determination that the Beef Promotion Act assessments implicate Frame's first amendment rights does not, however, end our inquiry. The rights of free speech and association are not absolute. Thus, we must next identify the proper standard for evaluating whether the statute, though affecting. Frame's first amendment rights, nevertheless passes constitutional muster. Frames concedes that the compelled speech at issue here qualifies as "commercial speech," which the Supreme Court has held receives a lesser degree of first amendment protection than "non-commercial speech." *See Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 637, 105 S.Ct. 2265, 2274, 85 L.Ed.2d 652 (1985). In *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), the Supreme Court set forth this less protective standard for evaluating constitutionality of commercial speech regulation, holding that the Constitution requires only that (1) the state "assert a substantial government interest"; (2) "the regulatory technique be in proportion to that interest"; and (3) the incursion on commercial speech be "designed carefully to achieve the State's goal." *Id.* at 564, 100 S.Ct. at 2350. Frame also claims, however, that compelled contributions to the Beef Promotion Program implicate his right to be free from compelled association, a claim we have already held to be sup-

---

**11.** We are not suggesting that that the nexus between Frame and the message is as close as the one found offensive in *Wooley.* But as the *Wooley* Court declared in comparing a compulsory flag salute to the "passive act" of carrying the state motto on a liscense plate, "the difference is essentially a matter of degree." 430 U.S. at 715, 97 S.Ct. at 1435.

We also note that the Beef Promotion Act advertisements actually shown to the public re-

inforce the connection between the individual producer, the Cattlemen's Board, and the message itself. The advertisements indicate only that they were funded by the "Beef Industry Council and Beef Board," without mention of the Secretary or the Department of Agriculture, thus failing to communicate that the advertisements are funded through a government program. (Exhibits 1–3).

ported by the *Abood* decision. *See Abood,* 431 U.S. at 222, 97 S.Ct. at 1792. As we read the Supreme Court's decision in *Roberts v. Unites States Jaycees,* 468 U.S. 609, 104 S.Ct. 3244, Frame's assertion of a free association claim triggers a higher standard of scrutiny than employed in cases involving only regulation of commercial speech.

 In *Roberts,* the Supreme Court held that government interference with associational rights must be justified by "compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.* at 623, 104 S.Ct. at 3252. In so holding, the majority declined to require an association to establish as a threshold matter that its expressive activities are primarily "noncommercial," and thus deserving of the full protection of the First Amendment. *See Id.* at 633–35, 104 S.Ct. at 3257–59 (O'Connor, J. concurring) (maintaining that regulation of commercial association incurs a less exacting standard of review). Accordingly, we will sustain the constitutionality of the Beef Promotion Act only if the government can demonstrate that the Act was adopted to serve compelling state interests, that are ideologically neutral, and that cannot be achieved through means significantly less restrictive of free speech or associational freedoms. *See Roberts,* 468 U.S. at 623, 104 S.Ct. at 3252; *Wooley v. Maynard,* 430 U.S. at 715–16, 97 S.Ct. at 1435–36; *Galda I,* 686 F.2d at 166–67. While the government's burden is a heavy one, *see Galda II,* 772 F.2d at 1066, we conclude that the importance of the governmental interest justifies the slight incursion on Frame's associational and free speech rights.[12]

### 1. *The Government's Interest*

Frame's characterization of the government interest here as "the interest in advertising beef," virtually concedes the importance of the interest cast by Congress: preventing further decay of an already deteriorating beef industry. That the interest advanced by the Beef Promotion Act is primarily economic does not diminish its importance. For example, the establishment of industrial harmony—although an "economic" interest—is sufficiently important to justify significant intrusions on the employees rights to associate. *See Ellis v. Brotherhood of Ry. Clerks,* 466 U.S. 435, 455–56, 104 S.Ct. at 1883, 1895–96, 80 L.Ed.2d 428 (1984). In this case, the national interest in maintaining and expanding beef markets proves similarly compelling. Widespread losses and severe drops in the value of inventory have driven many cattlemen to bankruptcy, as well as to the abandonment of ranching altogether. *See* Committee Report, Beef Research and Information Act, H.R.Rep. No. 452, 94th Cong., 1st Sess. 2–3 (1975). A continuation of this trend would endanger not only the country's meat supply, but the entire economy. *See id.* at 3; 121 Cong.Rec. H31439 (1975) (remarks of Rep. Santini); H.R.Rep. No. 271, 99th Cong., 1st Sess. 2 (1985), *reprinted in* 1985 U.S.Code Cong. & Admin.News 1103, 1111. The Act also furthers important non-economic interests.

---

**12.** The dissent asserts that the *Central Hudson* standard is applicable to Frame's free speech claim, dissent op. at 1146–47, a proposition with which we agree. By invalidating the Beef Promotion Act on this basis, however, the dissent need not consider Frame's free association claims. In contrast, we must consider both aspects of Frame's first amendment claims.

Of course, application of the less restrictive *Central Hudson* test bolsters, rather than undermines, our conclusion that the Act is constitutional. Convinced that the government's interest in preventing the collapse of a vital sector of the national economy qualifies as a compelling state interest, and that requiring beef producers to contribute to the cost of commercial advertis-

ing intrudes upon speech and association rights no more than necessary to achieve this goal, we find that the Act serves, at the very least, a "substantial" government interest, and that the Act is "carefully designed" to serve that goal, *see Central Hudson,* 447 U.S. at 564, 100 S.Ct. at 2350.

In addition, while we agree with the dissent's observation that the commercial speech cases identify the protection of the consumer as a "substantial" state interest, *see* dissent op. at 1147–48, we do not read these decisions to preclude, either expressly or implicitly, Congress from enacting legislation in furtherance of other sorts of interests that likewise qualify as "substantial."

Maintenance of the beef industry ensures preservation of the American cattlemen's traditional way of life. 121 Cong.Rec. H31436 (1975) (statement of Rep. Railsback).

The vehicle for funding the Beef Promotion Act, i.e., mandatory assessments to the Cattlemen's Board, plays an integral role in advancing both the economic and non-economic goals of the Act. Prior to the passage of the Beef Promotion Act in 1976, there had existed a Beef Promotion Board funded by voluntary contributions. In contrast, the Beef Promotion Act mandates assessments, presumably to prevent "free-riders" from receiving the benefits of the promotion and research program without sharing the cost. *See* 121 Cong.Rec. 31,448 (1976) (statement of Sen. Steiger) (proposed that contributions remain voluntary, but received no support). *See also* 121 Cong.Rec. 31,448 (statement of Rep. Poage) (consumers do not contribute to programs' cost and therefore are not entitled to representation on Cattlemen's Board).

The Cattlemen's Board and Operating Committee prove similarly crucial to the scheme. When the Beef Promotion Act was originally passed in 1976, its supporters emphasized that the Act is a "self-help program—which will cost the Government nothing." 121 Cong. Rec. 38,114 (statement of Sen. Talmadge). *See also* 121 Cong. Rec. 31,439 (legislation not "calling for a subsidy from Uncle Sam") (statement of Rep. Skubitz). In fact, while the bill originally required the government to bear the costs of the referendum if the program fails in referendum, *see* H.R.Rep. No. 452, 94th Cong., 1st Sess. 4 (1975), it was amended in committee so that the Cattlemen's Board would reimburse the Secretary for the cost of the referendum even if the producers ultimately voted to reject the program. 121 Cong. Rec. at 31,445 (1975). When the Beef Research and Information Act was revised and strengthened in 1985 to its present form, this beef promotion program was incorporated into the larger Food Security Act of 1985, 7 U.S.C. §§ 1281 *et seq.* (Supp. III. 1985), which aimed to protect the farm and livestock industry in "the face of the national deficit,

which requires the tightest possible constraint on federal spending." H.R.Rep. No. 271, 99th Cong., 1st Sess. 2 (1985), *reprinted in* 1985 U.S.Code Cong. & Admin. News 1103, 1113. In addition to these economic concerns, Congress intentionally structured this legislation as a "self-help" measure so as to ensure the support, and respect the integrity, of the independent American cattlemen. *See, e.g.,* 121 Cong. Rec. 38,116 (only "self-help" legislation proper for industry not traditionally recipient of government subsidies) (statement of Sen. Hansen); 121 Cong. Rec. 31,439 ("In keeping with their true free enterprise nature, cattlemen are asking only for enabling legislation") (statement of Rep. Santini); 121 Cong.Rec. 31,448 (1975) (statement of Sen. Baucus) (Montana ranchers historically unwilling to accept government handouts or interference).

### 2. *Ideological Neutrality*

The purpose underlying the Beef Promotion Act is ideologically neutral. The federal government seeks to bolster the image of beef solely to increase sales; it harbors no intent to "prescribe orthodoxy" or "communicate an official view," *see e.g., Wooley v. Maynard,* 430 U.S. at 716–17, 97 S.Ct. at 1436–37 (state required that license plates bear state motto to "promote appreciation of history, individualism, and state pride"); *West Virginia Bd. of Education v. Barnette,* 319 U.S. at 624–25, 63 S.Ct. at 1179 (compulsory flag salute sought to engender "national unity").

### 3. *Degree of Infringement on First Amendment Rights*

As we have noted, in *Abood v. Detroit Bd. of Education,* the Supreme Court acknowledged that agency shop agreements significantly infringe upon associational rights:

An employee may very well have ideological objections to a wide variety of activities undertaken by the union in its role of exclusive representative. His moral or religious views about the desirability of abortion may not square with the union's policy in negotiating a medi-

cal benefits plan. One individual might disagree with a union policy of negotiating limits on the right to strike, believing that to be the road to serfdom for the working class, while another might have economic or political objections to unionism itself. An employee might object to wage policy because it violates guidelines designed to limit inflation, or might object to the union's seeking a clause in the collective-bargaining agreement proscribing racial discrimination.

431 U.S. at 222, 97 S.Ct. at 1792. Nevertheless, the *Abood* Court reaffirmed the decision in *Railway Employees' Dept. v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956), and *International Ass'n. of Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), that "agency shop" or "union shop" agreements were constitutional insofar as the money was spent for collective bargaining, as the incursion had been sufficiently justified by the governmental interest in promoting industrial peace. *Abood,* 431 U.S. at 222, 224, 225, 97 S.Ct. at 1792, 1793, 1794. This was not true, however, as to expenditures unrelated to "the cause which justified bringing the group together." *Id.* at 223, 97 S.Ct. at 1793. Accordingly, the *Abood* Court held that dissenters may not be forced to contribute to political candidates and express political views unrelated to the union's duties as exclusive bargaining representative. *Id.* at 223–34, 97 S.Ct. at 1793–94.

In comparison with the broad constitutional incursions arising from agency and union shop agreements and countenanced in *Hanson, Street,* and *Abood,* the Beef Promotion Act's interference with first amendment rights appears slight. The Cattlemen's Board is authorized only to develop a campaign to promote the product that the defendant himself has chosen to market. Thus, the Cattlemen's Board is authorized only to engage in commercial

speech on behalf of beef producers. Unlike the union, the Board will not engage in activities that necessarily implicate a broad range of ideological, moral, religious, economic, and political interests, such as negotiation of wage increases, medical benefits, and limitations on the right to strike.

Furthermore, in *Ellis v. Brotherhood of Ry. Clerks,* 466 U.S. 435, 104 S.Ct. 1883, the Court explicitly recognized that spending for non-political purposes burdens first amendment rights less significantly than does spending for other purposes. In that case, the Supreme Court rejected a challenge by employees to the use of union funds for social activities, finding that compulsory contributions for these purposes do not implicate any greater infringement on first amendment rights than the permissible contributions already required for collective bargaining. *Id.* at 455–57, 104 S.Ct. at 1895–97. We find it significant that the Beef Promotion Act expressly prohibits spending for political activity. 7 U.S.C. § 2904(10) ("The order shall prohibit any funds collected by the Board under the order from being used in any manner for the purpose of influencing governmental action or policy, with the exception of recommending amendments to the order.").[13] This prohibition on political expenditures avoids what the Court has identified as what would be a significant incursion on Frame's constitutional rights, while ensuring that the extent of the interference here is no more than necessary to further the government's interest.

Nor have defendant's specific objections to the promotional activities authorized by the Beef Promotion Act persuaded us that the Act significantly burdens his first amendment rights. The *Abood* Court declared that "the individual cannot withdraw his support merely because he disagrees with the group's strategy." 431 U.S. at 223, 97 S.Ct. at 1793 (quoting *Machinists v. Street,* 367 U.S. at 778, 81 S.Ct. at 1805)

**13.** In accordance with this mandate, the Order provides, "No funds collected by the Board under this subpart shall in any manner be used for the purpose of influencing governmental policy or action, except to recommend to the Secretary amendments to this part," 7 C.F.R. § 1260.169(e), and also requires State beef councils to certify that they have not and will not use funds for the purpose of influencing governmental policy or action, 7 C.F.R. § 1260.201(b)(7).

(Douglas, J., concurring). In *Abood,* the employees asserted that the agency-shop clause forced them to contribute to "a number and variety of activities and programs which are economic, political, professional, scientific, and religious in nature of which Plaintiffs do not approve...." 431 U.S. at 213, 97 S.Ct. at 1788. Similarly, the plaintiffs in *Galda* expressly protested the coerced support of "ideological" activities. *Galda I,* 686 F.2d at 163. In contrast, Frame has vaguely claimed that the Cattlemen's Board "promotes a specific point of view, i.e., that the consumption of beef is desirable, healthy, nutritious", and he disagrees with the Board's "message and methods." Frame has failed to characterize his objection to the advertisements in a manner that would allow a reviewing court to reasonably infer a dispute over anything more than mere strategy. *See Abood,* 431 U.S. at 223, 97 S.Ct. at 1793.

In conclusion, although we find that the Beef Promotion Act implicates the first amendment rights of those obligated to participate, we hold that the government has enacted this legislation in furtherance of an ideologically neutral compelling state interest, and has drafted the Act in a way that infringes on the contributors' rights no more than necessary to achieve the stated goal.

## IV. THE FIFTH AMENDMENT

The Fifth Amendment forms the basis of two separate challenges by Frame to the constitutionality of the Beef Promotion Act. First, Frame claims that the Act unlawfully discriminates against producers in violation of the equal protection guarantee of the Fifth Amendment's Due Process Clause. Second, defendant claims that the Beef Promotion Act constitutes a "taking" of private property without a public purpose or just compensation.

### A. *The Equal Protection Guarantee*

The Fifth Amendment contains an implicit equal protection component that prohibits the federal government from discriminating between individuals or groups. *See Washington v. Davis,* 426 U.S. 229, 239, 96

S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976) (citing *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954)). Unless the statute creates a suspect classification or impinges upon a constitutionally protected right, however, it need only be shown that the differential treatment bears "some rational relationship to a legitimate state purpose." *City of Dallas v. Stanglin,* —— U.S. ——, 109 S.Ct. 1591, 1594, 104 L.Ed.2d 18 (1989). Rational-basis scrutiny is "the most relaxed and tolerant form of judicial scrutiny under the Equal Protection Clause." *Id.*

■ Frame argues to this court that the Beef Promotion Act assessments are "taken only from him, as beef producer, while the benefits of the advertising campaign inure to all those participating in the beef industry, such as packers, sellers, processors, transporters, and the like." In his answer and counterclaim, Frame complains only that the financial burdens of this Act are imposed in an arbitrary manner. In his brief, Frame concedes that "no fundamental right is herein involved," and therefore concludes that "the appropriate review is the rational or reasonable basis test." Accordingly, Frame argues that the Act "unreasonably" and "arbitrarily" discriminates against him in violation of the due process clause of the equal protection component of the due process clause of the Fifth Amendment.

Having held that the Beef Promotion Act did not interfere with Frame's first amendment rights because it finances government speech as opposed to coercing private speech, the district court viewed the Act as an economic regulation distributing economic burdens. Thus, the court determined that the government had demonstrated a "rational basis" for Congress' choice to levy the assessment only against beef producers and importers. 658 F.Supp. at 1481. The court suggested several possible rational bases for Congress' decision: first, that an assessment on the initial sale of cattle was more easily administered; second, that ranchers would be the most benefitted by the Act; third, that ranchers

could pass the assessment on to others in the industry. *Id.*

For the reasons cited by the district court, we agree that a rational basis clearly exists for choosing the beef producers to support the Board's activities. In support of the argument that Congress chose this assessment scheme on the basis of administrative ease, we note that the bill as it originally emerged from committee in 1975 was repeatedly criticized for the administratively burdensome "value added" provision, *see, e.g.,* H.R.Rep. No. 452, 94th Cong., 1st Sess. 16 (1975); S.Rep. No. 463, 94th Cong., 2nd Sess, 10, *reprinted in* 1976 U.S.Code and Cong. & Admin.News 1051, 1058, a feature that was eventually deleted in the 1985 version of the Act, *see* 7 U.S.C. § 2904(8)(C) (setting assessment at $1.00 per head of cattle). As an additional rationale, Congress may have wanted to grant the cattle producers the maximum influence possible in shaping this program, and therefore imposed upon the producers the financial burdens accompanying such power.[14]

### B. *The Assessment as an Unlawful "Taking"*

Frame claims that by forcing him to pay an assessment on cattle he produces, the government has engaged in a "taking" of private property which is "not for public use" and therefore unlawful. Defendant claims that the sole purpose of the Act "is to bolster, if possible, the position of the beef industry in the marketplace, a purely private, non-governmental purpose." The district court rejected this claim, holding that "the logic and the language of the statute dictate the conclusion that the assessment is imposed for public use." 658 F.Supp. at 1480. We agree.

Defendant's claim that the assessments mandated by the Act are not collected for a public purpose is without merit. While defendant is correct in asserting that the Fifth Amendment prohibits the government from taking property for private use, *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 241, 104 S.Ct. 2321, 2329, 81 L.Ed.2d 186 (1984), the Beef Promotion Act was clearly enacted for a public purpose. The determination of public versus private use initially belongs to the legislature. *See Berman v. Parker,* 348 U.S. 26, 32, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954). A court should not substitute its own judgment for that of the legislature as to what constitutes a public use "unless the use be palpably without reasonable foundation." *Hawaii Housing Authority,* 467 U.S. at 241, 104 S.Ct. at 2329 (quoting *United States v. Gettysburg Electric R. Co.,* 160 U.S. 668, 680, 16 S.Ct. 427, 429, 40 L.Ed. 576 (1896)).

It is apparent that Congress believed the Beef Promotion and Research Program to be in the public interest. Congress clearly articulated this belief in the Act itself:

> It, therefore, is declared to be the policy of Congress that *it is in the public interest to authorize the establishment,* through the exercise of the powers provided herein, *of an orderly procedure for financing* (through assessments on all cattle sold in the United State and on cattle, beef, and beef products imported into the United States) *and carrying out a coordinated program of promoting and research* designed to strengthen the beef industry's position in the marketplace....

7 U.S.C. § 2901(b) (emphasis added). Additionally, Congress declared in that same section that, "beef and beef products should be readily available and marketed

---

**14.** Frame never argued that strict scrutiny was appropriate under the equal protection analysis either in his answer and counterclaim, his motions before the district court, his briefs to this court, or during oral argument. Thus, neither the government nor the district court had the opportunity to consider either whether strict scrutiny would be applicable to Frame's claim, or whether the Act would pass constitutional muster under this more exacting standard of

review. Accordingly, we decline to address this issue in this appeal. *See Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (general rule that federal appellate court does not consider an issue not passed upon below); *Selected Risks Ins. Co. v. Bruno,* 718 F.2d 67, 69 (3d Cir.1983) (rule of discretion from which court has departed "when prompted by exceptional circumstances").

efficiently to ensure that the people of the United States receive adequate nourishment," 7 U.S.C. § 2901(a)(3), and that "the maintenance and expansion of existing markets for beef and beef products are vital to the welfare of beef producers ... as well as to the general economy of the Nation ...," *id.* § 2901(a)(4). As discussed in the previous section of this opinion, we believe that Congress had, at the very least, a "reasonable" basis for concluding that such legislation was in the public interest. Therefore, we hold that the assessment authorized under the Beef Promotion Act is not an unlawful taking.

## V. STATUTORY ARGUMENTS

Defendant advances two statutory arguments challenging the district court's order that he pay $66,625 in uncollected assessments and overdue charges. First, defendant argues that neither the Act nor the Order expressly or implicitly holds collecting persons personally liable for the amount of assessments they were obligated to, but did not collect. Second, defendant asserts that the late-payment charges for overdue assessments established by the Beef Order represents an administrative expansion of the Act.

### A. *Civil Cause of Action Against Collecting Persons*

Frame urges upon us several reasons why he cannot be held personally liable for uncollected assessments under this Act. First, Frame argues that nothing in the statutory history nor the Act itself suggests that Congress intended collecting persons to bear personal liability for uncollected assessments. In support of this argument, Frame emphasizes that the Act specifically provides that the assessment be levied against only producers and importers. Along similar lines, defendant further claims that the Secretary's own regulations indicate that producers alone may be held liable for the assessments. As proof, defendant cites language in the Order that provides:

> [f]ailure of the collecting person to collect the assessment on each head of cattle sold as designated in § 1260.311 shall

not relieve the producer of his obligation to pay the assessment to the appropriate qualified state beef council or the Cattlemen's Board as required in 1260.312.

7 C.F.R. § 1260.310(c). Second, Frame argues that the absence in § 2908 (which he describes as providing specific judicial and administrative remedies) of express authorization for an action for damages against collecting persons evinces congressional intent that no such suit be brought. Thus, Frame contends that the remedies contained in § 2908 are exclusive, and that the district court improperly "expand[ed] the coverage of the statute to subsume other remedies" not contemplated by Congress. Third, defendant argues that without a provision in either the Act or the Order specifying that personal liability will be imposed on collecting persons, it would be fundamentally unfair to find him liable here.

The government counters that the Act expressly authorizes the government to institute a civil cause of action against collecting persons to recover the amount of uncollected assessments. The government finds this express authorization in the combined reading of three separate sections of the Act: (1) subsection (b) of the "enforcement" provision, 7 U.S.C. § 2908, which vests the federal district courts with jurisdiction "specifically to enforce, and to prevent and restrain a person from violating" the Beef Order; (2) subsection (c) of the enforcement provision, *id.*, which directs that a "civil action authorized to be brought under this section" be referred to the Attorney General, "for appropriate action"; and (3) the provision mandating that "each person making payment to a producer for cattle purchased from the producer shall ... collect an assessment and remit the assessment to the Board," 7 U.S.C. § 2904(8)(A). The government asserts that taken together, these provisions expressly authorize a cause of action against defendant. Alternatively, the government argues that an implied right of action against collecting persons to recover uncollected assessments should be found to allow this court to enforce the congressional funding scheme.

The district court held that the Act and Order permitted the court to entertain a suit by the government against collecting persons for uncollected assessments. The district court first noted that § 2904(8)(A) of the Act and § 1260.312 of the Order[15] declared that "the defendants were responsible for the collection and remittance of assessments, and therefore, were required to collect assessments and to 'transmit assessments' to a qualified State beef council or the Board." *United States v. Frame,* No. 87–0474, 1988 WL 3849 (E.D.Pa. Jan. 19, 1988)(LEXIS, Genfed library, dist. file), slip op. at 4. In addition, noted the court, the statute and the regulations do not state that persons responsible for the collection and remittance of assessments need only "transmit those assessments actually collected" to the appropriate council or to the Board. *Id.* The court reasoned that to read the statute and regulations as such would "vitiate the 'responsibility' clearly placed upon the defendants." *Id.* Finally, relying on 2908(b) of the Act, which vests the courts with jurisdiction "specifically to enforce ... regulations made under the Act," the district court held that it was "a proper exercise" of its own "remedial power" to hold defendant liable for the unremitted assessments. *Id.*

As the availability of this remedy is a matter of congressional intent, our analysis begins with the terms of the statute. The "enforcement" section of the Act, which guides our inquiry, provides:

§ 2908. Enforcement.

(a) If the Secretary believes that the administration and enforcement of this Act [7 U.S.C. § 2901 et seq.] or order would be adequately served by such procedure, following an opportunity for an administrative hearing on the record, the Secretary may—

(1) issue an order to restrain or prevent a person from violating an order; and

(2) assess a civil penalty of not more than $5,000 for violation of such order.

(b) The district courts of the United States are vested with jurisdiction specifically to enforce, and to prevent and restrain a person from violating, an order or regulations made or issued under this Act [7 U.S.C. § 2901 et. seq.].

(c) A civil action authorized to be brought under this section shall be referred to the Attorney General for appropriate action.

7 U.S.C. § 2908.

Like the district court, we do not find that the Act expressly authorizes this suit. It is true enough that sections 2908(b) and (c) would be rendered meaningless if we did not fund them to authorize the Attorney General to initiate civil proceedings against all those persons subject to, and in violation of, the terms of the statute and regulations, including non-complying "collecting persons" such this defendant. This conclusion does not, however, resolve the question of whether Congress intended this particular remedy, i.e., personal liability for uncollected assessments, be exercised against this particular defendant, i.e., a collecting person. Not only does a cursory reading of the Beef Promotion Act reveal no express authorization for this suit, but a comparison with, for example, § 3102 of the Federal Insurance Contribution Act, I.R.C. § 3102(b) (1982), makes this patently clear. *See* I.R.C. § 3102(b) (in requiring that employers withhold from employees' wages taxes under the Federal Insurance Contribution Act, Congress expressly declared that "[e]very employer required to deduct the tax shall be liable for the payment of such tax.").

Nonetheless, we also reject Frame's contention that the Act's enforcement provisions, which do not mention civil liability of collecting persons, provide the "exclusive" means by which the Act may be enforced. The remedy section that Frame seeks to characterize as "exclusive" in fact appears to have been drafted to afford maximum flexibility in enforcement of the statute. The courts receive broad authority "specifi-

---

**15.** 7 C.F.R. § 1260.312 provides in pertinent part:

Each person responsible for the collection and remittance of assessment shall remit as-

sessments ... to the qualified State beef council ... [or] to the Cattlemen's Board....

cally to enforce" the Act and Order, as well as to "prevent and restrain a person from violating" the Act. 7 U.S.C. § 2908(b).[16] Similarly, the Act commits to the Attorney General's discretion the decision as to what constitutes "appropriate" action to remedy violations of the Act. 7 U.S.C. § 2908(c). In this case, the government seeks to recover damages resulting from Frame's calculated refusal to meet his obligations under the Beef Promotion Act to collect assessments, to remit assessments to the State beef council, and to maintain the necessary records. Thus, the issue before this court is whether, given Frame's repeated, willful violations of the Act, this suit is an "appropriate action," 7 U.S.C. § 2908(c), and whether it aids this court in "enforc[ing]" this Act, see 7 U.S.C. § 2908(b). We conclude that it does.

With the Beef Promotion Act, Congress intended to "authorize the establishment ... of an *orderly procedure for financing* ... a coordinated program of [beef] promotion...." 7 U.S.C. § 2901(b) (emphasis added). To establish such a procedure, Congress assigned to the persons who purchase the beef (denoted "collecting persons" by the Order) an integral role in the functioning of the finance machinery. Congress declared that these persons "shall" collect *and* remit the assessments due. 7 U.S.C. § 2904(8)(C). In addition, Congress determined that these persons would maintain records necessary to implement the Act. 7 U.S.C. § 2904(11). As a result of defendant's willful disregard of these obligations, the Cattlemen's Board has not had at its disposal over $50,000 in funds. For this court to require the government to collect the money due from each producer individually would frustrate the congressional purpose in assigning the responsibility of collection to these collecting persons, and thereby interfere with Congress' vision for the "orderly" financing of this program. In sum, we believe that allowing

the government to hold personally liable those persons who refuse to comply with the Act furthers the congressional goal in assigning such duties to defendant in the first instance.

Allowing this suit does not, as Frame claims, conflict with Congress' decision to levy the assessments against the producers only. Instead, the government seeks compensation for $50,000 worth of damages directly resulting from Frame's failure to meet his statutory duties. Therefore, the remedies here imposed do not conflict with Congress' funding scheme.

■ Nor do we believe that holding defendant personally liable here violates notions of fundamental fairness. First, the declaration in the Act's enforcement provision, 7 U.S.C. § 2908, that judicial or administrative proceedings could be brought against all violators of the Act, alerted Frame to the potential for liability. Additionally, we note that prior to the commencement of litigation, Frame received warnings from the Pennsylvania Beef Council, the Cattlemen's Board, and the Department of Agriculture about his noncompliance. Second, read together, §§ 1260.172 and 260.175 of the Beef Promotion Order indicate that collecting persons could incur some form of personal liability, at least in the form of a late payment charge. Section 1260.172(a)(5) requires all "remitting persons" to transmit assessments due to the Board to the qualified State beef council "on the 15th day of the month the cattle was purchased or marketed." Thus, collecting persons are held responsible for timely remission of assessments after cattle is purchased, apparently regardless of whether the assessments were collected. Meanwhile, § 1260.175 imposes a late-payment charge on "any unpaid assessments due the Board pursuant to § 1260.172." Because § 1260.172 holds

---

16. To further the statutory purpose and thus enforce Congress' will, courts have the inherent power to infer a remedy from a statutory scheme. *See, e.g., Wyandotte Trans. Co. v. United States*, 389 U.S. 191, 200–202, 88 S.Ct. 379, 385–86, 19 L.Ed.2d 407 (1967) (implying right of action in favor of the United States under the

Rivers and Harbors Act of 1899). This language in the Beef Act, however, amounts to an express grant of authority to fashion an appropriate remedy, thus removing all concerns that such action would prove contrary to congressional intent.

collecting persons responsible for timely remission, they received fair warning that they will incur at least a late charge for untimely remittance. In sum, Frame's personal liability for non-compliance does not amount to "fundamental unfairness."

## B. *Late–Payment Charge*

By regulation, "remitting persons" must remit to the qualified State beef council all assessments not later than the 15th day of the month following the month in which the cattle were purchased or marketed. 7 C.F.R. §§ 1260.172(a)(5), 1260.312(c). The Beef Promotion Order also provides that any overdue assessments will be increased by 2% each month, beginning the day after such assessments were due. 7 C.F.R. § 1260.175. The district court directed Frame to pay $14,395.11 in "applicable late payment charges."

Defendant claims that the charge is a "penalty" for late payment that contradicts the terms of the Beef Promotion Act, which sets assessments at $1.00 per head of cattle and which makes no mention of a late-payment charge. In the request for supplemental briefs, this court also directed the parties to discuss whether the provision in the Beef Promotion Act authorizing a civil penalty of up of $5,000 was intended to be exclusive, thereby precluding the Secretary from imposing this additional sanction.

The government responds that the Secretary draws his authority to impose a late-payment charge from § 2904(12), which authorizes inclusion in the order of all terms and conditions "as necessary to effectuate the provisions of the order," which are "not inconsistent with the provisions of the Act." 7 U.S.C. § 2904(12). The government asserts that the late payment charge is consistent with the purposes of the Act, and is not a "penalty," but rather "a remedial measure."

 The validity of this late charge depends on whether it is properly characterized as a "penalty" or a "remedial measure." If this charge were an additional penalty imposed by the Secretary, it would be invalid. "It is settled law that penal statutes are to be construed strictly and one is not to be subject to a penalty unless the words of the statute plainly impose it." *Commissioner v. Acker*, 361 U.S. 87, 91, 80 S.Ct. 144, 147, 4 L.Ed.2d 127 (1959). Additionally, § 2908 of the Beef Promotion Act expressly provides for a civil penalty of not more than $5,000, to be imposed only after an administrative hearing, which indicates that Congress did not commit to agency discretion the amount of penalty to be incurred. It is necessary, however, to distinguish an administrative action that qualifies as a "penalty" from one properly characterized as a "remedial measure." *See, e.g., Gold Kist v. U.S. Dept. of Agr.*, 741 F.2d 344, 347–48 (11th Cir.1984) (monetary fine for violation of peanut production and marketing quotas invalid as a penalty); *West v. Bergland*, 611 F.2d 710, 722 n. 14 (8th Cir.1979) (withdrawal of meat grading services valid as a remedial sanction), *cert. denied*, 449 U.S. 821, 101 S.Ct. 79, 66 L.Ed.2d 23 (1980); *Jacquet v. Westerfield*, 569 F.2d 1339, 1345 (5th Cir.1978) (temporary disqualification from the Food stamp program of household found to acquire coupons by fraud distinct from penalty provisions of Act). *See also Commissioner v. Acker*, 361 U.S. at 91 n. 4, 80 S.Ct. at 147 n. 4 (Not only did Commissioner of Internal Revenue concede that the imposition of an additional tax by IRS for substantially underestimating estimated taxes was a penalty, the language of the statute characterized the tax as imposed for "breach of a statutory duty," and as an "addition to the tax itself," which could not be regarded as interest on money owed).

Courts that have addressed the issued have offered various definitions for distinguishing between penal and remedial sanctions.

"Penal means punishable; inflicting a punishment; constituting a penalty; or relating to a penalty." Black's Law Dictionary 1289 (4th ed. 1957). The dictionary also defines "penal laws" as "[t]hose which prohibit an act and impose a penalty for the commission of it.... Strictly and properly speaking, a penal law is one imposing a penalty or punishment (and properly a pecuniary fine or

mulct) for some offense of a public nature or wrong committed against the state." *Id.*

*Gold Kist,* 741 F.2d at 348. Similarly, the *West* court explained that where the purpose of the sanction was "not to stigmatize or punish wrongdoers," it is remedial rather than punitive. 611 F.2d at 722 n. 14. The *West* court also suggested that whether the sanction is not reasonably related to the regulation's authorized remedial purpose, it may also be invalid as punitive. *Id.* (citing *Beck v. SEC,* 430 F.2d 673 (6th Cir.1970)).

Assuming that the Secretary's action here is not a "penalty," we apply an additional test to determine the propriety of the Secretary's imposition of the late-payment charge, a test which overlaps with our inquiry into whether the charge qualifies as a "remedial action" or a "penalty." Where Congress has authorized the agency to make such rules and regulations as may be necessary to carry out the provisions of the Act, the agency has the power to impose remedial measures that are "reasonably related" to the purpose of the enabling legislation. *See West v. Bergland,* 611 F.2d at 721 (quoting *Mourning v. Family Publication Service, Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973)); *Jacquet v. Westerfield,* 569 F.2d at 1345. Section 2904(12) of the Beef Promotion Act authorizes inclusion in the order of all terms and conditions "necessary to effectuate the provisions of the order." Thus, if the late-payment charge is remedial, it is valid provided there exists a rational relationship between the charge and the purposes of the Beef Promotion Act.[17]

■ Applying these definitions, we believe that the charge here is remedial rather than penal, and is a valid exercise of the Secretary's power to include in the Order all terms "necessary to effectuate the provisions of the order." The purposes of the Beef Promotion Act is to establish "an orderly procedure for financing (through assessments on all cattle sold ...) and carrying out a coordinated program of promotion and research...." 7 U.S.C. § 2901(b). As we have noted, the program receives no other funding. The late-payment charge imposed by the Secretary is reasonably related to the purposes of the Act as a measure to facilitate the timely remittance of assessments—funds without which the beef promotion and research program cannot operate. Thus, it is not dispositive that this remedial sanction is pecuniary, which distinguishes this case from *Gold Kist v. U.S. Dept. of Agr.,* 741 F.2d 344, where the court held that a pecuniary fine was a penalty, not a remedial measure. In *Gold Kist,* however, the purpose of the statute was to limit the amount of the peanuts sold in the domestic market; therefore, because the pecuniary sanction bore no relation to the purpose of the statute, the court properly characterized the monetary fine as a penalty. *See id.* at 347–48. In addition, while the 2% per month charge imposed on Frame sufficiently exceeds market interest rates for loans so as to operate as an incentive for timely payment, the charge is not so onerous as to operate as a means of inflicting punishment for wrongdoing. Furthermore, the late charge appears to be no higher than would be reasonable to cover the interest lost on the unpaid money, as well as the additional administration costs incurred in connection with collection efforts.

Costs to be taxed against appellants.

SLOVITER, Circuit Judge, dissenting.

## I.

The Beef Promotion and Research Act (the Act) is so unique in the annals of our case law that there is no true analytic analog. To understand what the program is, it is necessary to outline what it is not. This is, first of all, not a regulatory program. This is not representative of those

---

**17.** This section also provides that the provisions of the Act may not be "inconsistent with the provisions of the Act." 7 U.S.C. § 2904(12). If the late-payment charge is a penalty, then it is inconsistent with the express provision in § 2908 for a civil penalty of not more than $5,000.

programs where Congress, primarily for the national interest and secondarily for the interest of the industry, has determined that regulation of some aspects of the production, price, or standardization of a commodity is required. *See, e.g., United States v. Sullivan,* 332 U.S. 689, 698, 68 S.Ct. 331, 336, 92 L.Ed. 297 (1948) (federal law requiring standardized drug product labels upheld); *Wickard v. Filburn,* 317 U.S. 111, 128–29, 63 S.Ct. 82, 90–91, 87 L.Ed. 122 (1942) (wheat production quotas upheld); *United States v. Wrightwood Dairy Co.,* 315 U.S. 110, 121, 62 S.Ct. 523, 527, 86 L.Ed. 726 (1942) (fixing of minimum prices for milk upheld); *Sunshine Anthracite Coal Co. v. Adkins,* 310 U.S. 381, 393–94, 60 S.Ct. 907, 912–13, 84 L.Ed. 1263 (1940) (fixing of minimum prices for bituminous coal upheld). Neither the Beef Promotion and Research Act nor its offspring, the Cattlemen's Board and the Operating Committee, perform any regulatory role with respect to beef or cattle prices, production, standardization or testing. Therefore, the majority's statement that this program "resembles a number of recent congressional enactments designed to make various federal regulatory programs partially or entirely self-financing," maj. op. at 1122, is, I respectfully note, unsupportable.

The *only* "regulatory" aspect of this program which the majority has been able to identify is the "attempt to bolster the public image of a product in order to increase consumer demand." *Id.* at 1126. The advertising of a product does not fit within the accepted meaning of "regulation." *See, e.g.,* "regulate: ... 1: to govern or direct according to rule ... 2a: to reduce to order, method, or uniformity ... 3: to fix the time, amount, degree, or rate of." *Webster's Third New International Dictionary* 1913 (1976). I do not view the compulsion that all sellers of cattle contribute financially to the industry message by proclaiming in Madison Avenue style the value of beef over the radio and television stations of the United States to be a regulatory program.

Of course, trade associations routinely perform such functions, but never before

to my knowledge has any court held that an industry member must be *forced* to contribute to such a program, and to do so at the pain of a suit by the United States Justice Department seeking to collect the substantial payment assessed *and* a penalty of 2% a month.

Although I believe that this statute can be challenged on more than one ground, I believe that it is sufficient to rest this dissent on the statute's incompatibility with the principles protected by the First Amendment. Specifically, I believe that the central provision of the Act which assesses a mandatory non-refundable fee for general promotional advertising of the benefits of beef consumption violates Frame's First Amendment right to freedom to refrain from engaging in commercial advertising. Even if the First Amendment rights implicated in this case are not absolute, I believe that the government has failed to show that the scheme is carefully tailored to pose no greater burden than necessary in light of the government interest asserted.

## II.

Contribution of money to further the projection of a message is a form of speech, *see Buckley v. Valeo,* 424 U.S. 1, 16–17, 96 S.Ct. 612, 633–34, 46 L.Ed.2d 659 (1976), and it follows, as the majority recognizes, that mandated contribution of money for purposes of funding advertisements implicates Frame's rights against forced speech. We can thus begin our analysis with the line of cases which have struck down government requirements that individuals endorse particular ideas, whether through a pledge of allegiance, *West Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), mandated display of a state motto on automobile license plates, *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), or payment of dues for a labor union's political activities, *Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977); *see also Galda v. Rutgers,* 772 F.2d 1060 (3d Cir.1985), *cert. denied,* 475 U.S. 1065, 106 S.Ct. 1375,

89 L.Ed.2d 602 (1986) (university's requirement that students contribute to nonpartisan student lobbying organization violates First Amendment). A variation of these principles was recently applied in *Pacific Gas & Electric Co. v. Public Utilities Commission*, 475 U.S. 1, 9, 15, 106 S.Ct. 903, 908, 911, 89 L.Ed.2d 1 (1986), where the Court held unconstitutional a state Public Utility Commission requirement that a private utility provide access in its billing envelopes to other views. The plurality explained that a state may not require a utility company to "associate with speech with which [it] may disagree." *Id.* at 15, 106 S.Ct. at 911.

These cases proceed from the recognition that compulsion of speech can be equated with suppression of speech because the two are "complementary components of the broader concept of 'individual freedom of mind.'" *Wooley*, 430 U.S. at 714, 97 S.Ct. at 1435 (quoting *Barnette*, 319 U.S. at 637, 63 S.Ct. at 1185); *see also Riley v. National Fed'n of the Blind*, — U.S. ——, 108 S.Ct. 2667, 2677, 101 L.Ed.2d 669 (1988) (" 'freedom of speech' [is] a term necessarily comprising the decision of both what to say and what *not* to say") (emphasis in original).

In *Abood*, the case most apposite to the facts here, the Court held that although a public employee, as well as a private employee, can be required to contribute to the costs of exclusive union representation despite the employee's "ideological objections" to the union's activities, 431 U.S. at 222, 97 S.Ct. at 1792, it was unconstitutional to mandate assessment of funds to finance the union's political and ideological activities that were extraneous to its collective bargaining duties. Quoting from precedent and from Madison and Jefferson, *id.* at 234–35 & n. 31, 97 S.Ct. at 1799, n. 31 (" ' "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves is sinful and tyrannical" ' "), the Court found that the principles of the First Amendment "prohibit the appellees from requiring any of the appellants to contribute to the support of an ideological cause he may oppose." *Id.* at 235, 97 S.Ct. at 1799.

Admittedly, there is a lesser impact on the freedom of conscience and belief which underlay the *Barnette–Wooley* line of cases where, as here, the compelled speech is of a commercial nature. The Court's opinions analyzing commercial speech stress, however, that important First Amendment values are at stake even in the commercial speech context.

Even though the rationale often given for the protection of commercial speech which focuses on the "consumer's interest in the free flow of commercial information," *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 763, 96 S.Ct. 1817, 1826, 48 L.Ed.2d 346 (1976), is inapplicable here, this cannot mean that the government is free to compel its citizens to support commercial speech. It can no more compel me to advertise a product on the outer wall of my home than it can compel me to carry a similar sign on the back of my jacket. Similarly, it cannot compel me to contribute my money to permit a private group to perform that function. The fact that, as the government stresses, I may retain my right "to criticize any aspect of the government's promotional program," Brief for the Appellee at 32, does not alter the unassailable fact that the compulsion to utter or support commercial speech would "force [me] ... to alter [my] speech to conform with an agenda [I have] not set." *Pacific Gas*, 475 U.S. at 9, 106 S.Ct. at 908.

I believe it is immaterial whether Frame's objection is for ideological reasons or libertarian ones, or even whether such reasons may also be in part colored by economic considerations. The government in its motion for summary judgment did not argue that Frame's objection is frivolous or not sincerely held. If the genuineness of his objection were a material issue, then he would be entitled to a hearing for that purpose.

Forced speech must, of course, be distinguished from government speech. I agree with the majority's analysis leading it to the conclusion that the "self-help program for the beef industry" is not transformed

"into 'government speech.'" Maj. op. at 1134–35. Regardless of whether the industry board should be considered a public or private organization, *see* L. Tribe, *American Constitutional Law* § 12–4 at 807 n. 14 (2d ed. 1988), it is clear that the message in this case is not one by the government as "representative of the people," but reflects speech by "one segment of the population, with certain common interests." *Abood*, 431 U.S. at 259 n. 13, 97 S.Ct. at 1811–12 n. 13 (Powell, J., concurring).

This is an important step in our understanding of what is involved in this case. For example, if the government were to use general revenue funds to proselytize the proposition, well established through medical/scientific studies, that smoking is harmful to one's health and general well being, surely the tobacco industry would not be able to argue that the use of government funds for that purpose violated the First Amendment rights of those who disagree with the message. The almost unlimited right of the government to spend general revenue funds would preclude such an argument even if the government speech were less soundly based, such as, for example, were it to promote the converse proposition encouraging smoking. Applying this proposition more directly here, if the Secretary of Agriculture had determined that maintenance and growth of the cattle industry were necessary to the well-being of the industry and the general welfare, and accordingly used funds appropriated tm his department from general revenues to promote consumption of beef, those who disagreed with the message, such as vegetarians or animal rights advocates, could not complain on First Amendment grounds. Once we pass, however, from government speech, financed by general revenues, to forced speech, effected through the compelled monetary contribution from a discrete group to support a private business advertising campaign, the reasoning that precludes challenge to government speech no longer applies.

Because, as I noted above, there is no precedent for the kind of compelled commercial speech at issue here, it is difficult to find the appropriate framework for analysis. The majority's framework, which would examine if the regulations are "adopted to serve compelling state interests, that are ideologically neutral, and that cannot be achieved through means significantly less restrictive of free speech or associational freedoms," maj. op. at 1134, comes primarily from cases analyzing when infringements on the right to associate for expressive purposes may be justified. I doubt that the type of compelled speech at issue here can be justified on any basis. Nonetheless, I do not reach the majority's more stringent associational rights standard because I believe that no justification can be found, even under the less exacting criteria adopted by the Supreme Court in evaluating the permissibility of regulation of commercial speech. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

In *Central Hudson*, where the Court struck down a state utility commission's ban on promotional advertising by electric utilities which had been imposed with the aim of reducing the demand for electricity in response to the nation's energy crisis, the Court held that "commercial speech," *i.e.*, expression "proposing a commercial transaction" and "related solely to the economic interest of the speaker and its audience," 447 U.S. at 561–63, 100 S.Ct. at 2348–50, is encompassed by the First Amendment, *id.* at 561, albeit with "a lesser protection" than accorded to other types of expression, *id.* at 563, 100 S.Ct. at 2350. From this principle have come cases such as *Virginia Board of Pharmacy*, 425 U.S. at 770, 96 S.Ct. 1829 (striking state ban on drug price advertisement); *Consolidated Edison Co. v. Public Service Commission*, 447 U.S. 530, 532, 100 S.Ct. 2326, 2330, 65 L.Ed.2d 319 (1980) (invalidating state's ban on utilities' use of bill inserts to discuss "controversial issues of public policy"); and *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 68, 103 S.Ct. 2875, 2881, 77 L.Ed.2d 469 (1983) (state could not ban commercial speech advertising condoms).

The Court explained that in cases involving commercial speech, "[t]he State must assert a substantial interest to be achieved by restrictions on commercial speech"; "the regulatory technique must be in proportion to that interest"; and the "limitation on expression must be designed carefully to achieve the State's goal." *Central Hudson*, 447 U.S. at 564, 100 S.Ct. at 2350.

Probably the most substantial government interest that can be asserted to regulate commercial speech is in protection of the consumer. *See, e.g., Central Hudson*, 447 U.S. at 578, 100 S.Ct. at 2357 (Blackmun, J., concurring). Thus, for example, to return to the tobacco example, the government or its agencies may require harmful products, such as cigarettes, to carry a warning legend. *See* 15 U.S.C. § 1333 (1982); *see also United States v. Sullivan*, 332 U.S. at 698, 68 S.Ct. at 336 (upholding federal law requiring warning labels on drugs). Here, however, the government interest asserted is not one of protection of the public from fraud, illegal activity, or harmful health effects. The advertisements are not akin to the promotion of public welfare by public service messages concerning nutrition and health. Instead, as described variously by the majority, the government's goal in the program is to "strengthen the beef industry's position in the marketplace," maj. op. at 1122, to prevent the "decay" of this industry, *id.* at 1134, and "to communicate [a] message that beef is good," *id.* at 1131. While the government has a general interest in the health of the beef industry, it does not follow that the government has a substantial interest in compelling the beef industry to make and support such a promotion campaign. Instead, as the majority points out in rejecting the district court's argument that the advertisements are a form of public service announcement, the messages represent the economic interests of "one segment of the population," maj.

op. at 1133 (quoting *Abood*, 431 U.S. at 259 n. 13, 97 S.Ct. at 1811–12 n. 13 (Powell, J., concurring)). Thus, even if the standard by which the government's interest should be evaluated is a "substantial" interest rather than a "compelling" one, which the majority uses, I cannot conclude that the government's interest in a program of this kind is sufficiently substantial to permit it to compel speech.

The majority argues that the purpose underlying the Act is "ideologically neutral." Maj. op. at 1135. Although beef promotion may be less ideological than the motto "Live Free or Die," *Wooley v. Maynard*, 430 U.S. at 707, 97 S.Ct. at 1431, I am less persuaded than the majority is that beef promotion does not implicate ideological concerns. There are exhibits in this record of an advertisement funded under the Act stating, "the lowdown on beef is probably less than you think—lower in calories, leaner on fat, lighter on cholesterol than you ever imagined," and another quoting the actress Cybill Sheperd saying, " 'I know some people who don't eat hamburgers. But I'm not sure I trust them.' " These messages may be found ideologically offensive by groups which espouse vegetarianism for religious or moral reasons. Moreover, the health effect of eating substantial quantities of beef is a matter of some controversy. For centuries it has been said that, "One man's meat is another's poison." [1]

Turning then to the third criterion applied by the majority, the degree of infringement on First Amendment rights or, put in *Central Hudson* terms, whether the regulation is "not more extensive than is necessary to serve [the government] interest," 447 U.S. at 566, 100 S.Ct. at 2351, the majority summarily concludes, without analysis, that the Act is drafted "in a way that infringes on the contributors' rights no more than necessary." Maj. op. at 1137. [2]

---

**1.** *See, e.g.,* Lucretius, *De Rerum Natura,* bk. IV, 1. 637; Beaumont and Fletcher, *Love's Cure,* act III, sc. ii (1647); O. Dykes, *English Proverbs* (1709), *cited in* J. Bartlett, *Familiar Quotations* 101 & n. 6 (15th ed. 1980).

**2.** We note in passing that the refund provision of the original Beef Research and Information Act of 1976, *see* Pub.L. No. 94–294, 90 Stat. 529, 535 (1976), was deleted from the 1985 version of the statute. The new statute permitted producers to demand a one-time refund of assessments

This conclusion is apparently based on the majority's earlier reasoning that the Act mandates assessments "presumably to prevent 'free-riders' from receiving the benefits of the promotion and research program without sharing the cost." Maj. op. at 1135. There is, however, nothing in the record to support the assumption that there would be insufficient voluntary contributions by those cattle producers who support the program to provide the funds necessary to continue such promotion. The record shows that support for the program within the industry has grown.[3]

Trade association and industry promotion programs are supported throughout the country through voluntary contributions by those in the industry convinced that the programs inure to their benefit, although they realize that non-members may also get some benefit. Therefore, even if one were to overcome the, for me insurmountable, hurdle imposed by the need to show a sufficiently substantial government interest in the promotion program, there is absolutely no basis other than speculation from which one could conclude that the contributions compelled from those who choose not to make them are necessary to the beef promotion goal.

The free rider issue raised here is unlike the mandatory assessment of union dues. Cases upholding the latter do so because of the legislative judgment that "it would pro-mote peaceful labor relations to permit a union and an employer to conclude an agreement requiring employees who obtain the benefit of union representation to share its cost." *Abood*, 431 U.S. at 217–23, 97 S.Ct. at 1790–93; *see also Chicago Teachers Union, Local 1 v. Hudson*, 475 U.S. 292, 301 & n. 8, 106 S.Ct. 1066, 1073 & n. 8, 89 L.Ed.2d 232 (1986) (citing cases). The function performed by a self-promoting industry group is hardly comparable. *See Ellis v. Brotherhood of Ry., Airline & S.S. Clerks*, 466 U.S. 435, 455–56, 104 S.Ct. 1883, 1895–96, 80 L.Ed.2d 428 (1984) ("It has long been settled that ... interference with First Amendment rights [through mandated union contributions] is justified by the governmental interest in industrial peace.") (citations omitted).

While fees assessed for industry self-regulation, such as user fees, have been upheld as a fair allocation of the costs of regulation on those whose industry benefits therefrom, *see Skinner v. Mid–America Pipeline Co.*, —— U.S. ——, 109 S.Ct. 1726, 1734, 104 L.Ed.2d 250 (1989), that line of cases, relied on by the government, cannot be used to uphold a mandated contribution towards speech with which the contributor is unwilling to associate. I fear that the majority's opinion crosses a threshold leading us to mandated contributions for speech and advertisements which we cannot presently envisage and which would

collected during the period prior to the referendum, *see* 7 U.S.C. § 2907(c) (Supp. III 1985), 7 C.F.R. §§ 1260.173–.174 (1988), but includes no provision for refunds of assessments collected after this referendum. In this respect, it is unlike some of the other similar programs for promoting agricultural products. *See, e.g.,* The Cotton Research and Promotion Act of 1966, 7 U.S.C. § 2110 (1982) ("any cotton producer against whose cotton any assessment is made ... and who is not in favor of supporting the research and promotion program as provided for herein shall have a right to demand and receive from the Cotton Board a refund of such assessment."); the Watermelon Research and Promotion Act of 1985, 7 U.S.C. § 4906(h) (Supp. III 1985) (similar); the Potato Research and Promotion Act of 1971, 7 U.S.C. § 2617(g) (1982); the Honey Research, Promotion and Consumer Information Act of 1984, 7 U.S.C. § 4608(h) (Supp. II 1984). Even if one were to conclude that industry members could be compelled to contribute to industry research and that the funds collected under the Act are sponsoring such research (a fact on which the record is silent), there is no reason shown why the amounts necessary to support such research, as distinguished from the amounts needed for the promotion campaign, cannot be calculated before the assessment. *See Chicago Teachers Union, Local 1 v. Hudson*, 475 U.S. 292, 305–06, 106 S.Ct. 1066, 1075–76, 89 L.Ed.2d 232 (1986).

3. Originally the Act did not become operative because it received only 56.4% in 1978 rather than the two-thirds vote then needed, and in 1980 could not even reach the majority needed under the revised statute. *See* L. Glaser, Provisions of the Food Security Act of 1985, at 74–75 (U.S. Dep't of Agriculture Information Bulletin No. 498, 1986). After the Act was amended to put it into effect before any vote, subject to a referendum thereafter, 78.9% of the voters approved its operation, thereby making the Act and the assessments permanent.

make a mockery of the First Amendment protection accorded "the decision of ... what *not* to say." *See Riley,* 108 S.Ct. at 2677 (emphasis in original).

For the reasons set forth, I respectfully dissent from the majority's opinion and judgment.