2002 D.S.D. 18

LIVESTOCK MARKETING ASSOCIATION, an association of livestock markets, the Western Organization of Resource Councils, an association of grassroots of organizations that seek to protect natural resources, family farms, and rural communities, and Robert Thullner, Johnny Smith, Ernie J. Mertz, John Willis, Pat Goggins, Herman Schumacher, Jerry Goebel, and Leo Zentner, on behalf of themselves and others similarly situated, Plaintiffs,

.v.

UNITED STATES DEPARTMENT OF AGRICULTURE, Ann Veneman, Secretary of Agriculture, and the Cattlemen's Beef Board, an organization of cattle producers and importers charged with implementing the Beef Research and Promotion Order, Defendants,

Nebraska Cattlemen, Inc., Gary Sharp, and Ralph Jones, Intervenors–Defendants.

No. Civ. 00–1032.

United States District Court, D. South Dakota, Northern Division.

June 21, 2002.

Philip C. Olsson, Naomi J.L. Halpern, Ryan W. Stroschein, Olsson, Frank & Weeda, P.C., Washington, DC, Scott N. Heidepriem, Ronald A. Parsons, Jr., Johnson, Heidepriem, Miner, Marlow & Janklow, Sioux Falls, South Dakota, for plaintiffs.

Ori Lev, Thomas Millet, Carolyn McKee, U.S. Department of Justice, Washington, DC, Cheryl Schrempp Dupris, Assistant U.S. Attorney, Pierre, South Dakota, for defendants.

Jeffrey Alan Cole, Frieberg, Zimmer, Duncan & Nelson, Parker, South Dakota, Robert B. Frieberg, Gregory Thomas Brewers, Frieberg, Zimmer, Duncan & Nelson, Beresford, South Dakota, David S. Day, University of South Dakota School of Law, Vermillion, South Dakota, for intervenor-defendants.

## MEMORANDUM OPINION AND ORDER

KORNMANN, District Judge.

### INTRODUCTION

[¶ 1.] Plaintiffs instituted this action to challenge certain activities in connection with the Beef Promotion and Research Act (Title XVI, Subtitle A, of the Food Security Act of 1985), Pub.L. 99–198, Title XVI, § 1601, codified at 7 U.S.C. §§ 2901–11 ("the Act") and certain actions and inaction on the part of the United States Secretary of Agriculture ("Secretary") and the Cattlemen's Beef Board ("Board"). The Act authorizes the Secretary to promulgate a Beef Promotion and Research Order ("Order"), 7 U.S.C. § 2903, to establish a Cattlemen's Beef Promotion and Research Board ("Board"), 7 U.S.C. § 2904, and an Operating Committee, 7 U.S.C. § 2904(4)(A), to carry on a "program of promotion and research designed to strengthen the beef industry's position in the marketplace and to maintain and expand domestic and foreign markets and uses for beef and beef products." 7 U.S.C. § 2901(b). The program is funded by mandatory producer and importer contributions of one dollar per head on each transaction. 7 U.S.C. § 2904(8)(C). These mandatory contributions are referred to collectively as the "beef check-off."

[¶ 2.] In fiscal year 2001, beef checkoff revenues totaled $86,099,403.00. Of that, $47,469,581.00 went to the Board. In states with a Qualified State Beef Council ("QSBC"), such as South Dakota, all checkoff funds collected by livestock markets go to the QSBC. There are 45 QSBC organizations. Each QSBC sends 50 cents to the Board, 25 cents to the National Cattleman's Beef Association ("NCBA"), a private trade group, for use in its non-Beef Board activities. The amount going to the Board included $60,907.00 collected from producers in states without a QSBC, $8,778,852.00 from importers, and $38,629,822.00 from QSBCs. The remaining funds were used by the QSBCs. The NCBA is the federation of QSBC's. The NCBA is a private contractor with the Board and 90% of all Board contracts are awarded to the NCBA. The Board consists of 110 members. The QSBC's nominate ten members to serve on the Beef Operating Committee which approves the budgets of the Board. The Board elects the Operating Committee.

[¶ 3.] In 1998, the Livestock Marketing Association ("LMA") initiated a petition drive to obtain a referendum on the question of the continuation of the beef checkoff program. LMA submitted the petitions to USDA on November 12, 1999. The Secretary did not act to validate the petitions and schedule a referendum vote. Plaintiffs instituted this litigation seeking 1) a declaratory judgment that the 1985 Act and the Secretary's action or inaction pursuant thereto is unconstitutional in violation of plaintiffs' rights to due process and equal protection, 2) an injunction prohibiting the Secretary from collecting assessments pursuant to the 1985 Act, 3) a preliminary injunction ordering defendants to immediately schedule a referendum election as to whether the checkoff should be retained or, alternatively, ordering defendants to immediately decide whether to schedule such a referendum, and 4) an order requiring the Board to immediately cease its expenditures for so-called "producer communications" and to make restitution to producers for in excess of $10 million claimed to have been illegally expended on such communications since 1998.

[¶ 4.] Plaintiffs' claims that the Board's producer communications activities violate both the Act and the First Amendment by using checkoff funds to disseminate public

relations messages, including anti-referendum messages, and their claims that in implementing the petition validation program, the Secretary has failed to comply with the requirements of the Paperwork Reduction Act of 1995, were heard on January 25, 2001. The court issued a preliminary injunction on February 23, 2001. This prevented defendants from any further use of beef checkoff assessments to create or distribute any material for the purpose of influencing governmental action or policy with regard to the beef checkoff or the Board or both. It also prevented defendants from using assessments to block or discourage a referendum, from using assessments to attempt to influence beef producers to keep the Board or the checkoff program or both in existence, and from using assessments to laud the checkoff program by using descriptive words or phrases such as "fair", "accountable", "effective", "it's working", and the like. *Livestock Marketing Association v. United States Department of Agriculture,* 132 F.Supp.2d 817 (D.S.D.2001).

[¶ 5.] The United States Supreme Court issued a decision on June 25, 2001, in *United States Department of Agriculture v. United Foods, Inc.,* 533 U.S. 405, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001), holding that the mandatory checkoff for mushroom promotions was in violation of the First Amendment and striking down as unconstitutional all portions of the Mushroom Act of 1990 which "authorize such coerced payments for advertising." *United Foods v. U.S.,* 197 F.3d 221, 225 (6th Cir.1999), *aff'd* 533 U.S. 405, 121 S.Ct. at 2341, 150 L.Ed.2d 438. Following the issuance of the *United Foods* decision, the plaintiffs were allowed to amend their complaint to add a claim that the beef checkoff program violated plaintiffs' First Amendment rights to freedom of speech and freedom of association. The parties filed cross motions for summary judgment on the new First Amendment claims and those motions were denied. The First Amendment claims were bifurcated and a trial to the court on those issues was held on January 14, 2002.

## DECISION

### I. Standing.

[¶ 6.] Defendants and intervenors contend that plaintiffs LMA and the Western Organization of Resource Councils ("WORC") lack standing to raise the First Amendment claims at issue here. Standing is comprised of three elements:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (internal quotations and citations omitted). It is sufficient to confer standing that at least one of the plaintiffs qualifies and, if so, the court does not need to consider the standing issue as to the other plaintiffs in that action. *Bowsher v. Synar,* 478 U.S. 714, 721, 106 S.Ct. 3181, 3185, 92 L.Ed.2d 583 (1986), *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264 n. 9, 97 S.Ct. 555, 562 n. 9, 50 L.Ed.2d 450 (1977).

[¶ 7.] Plaintiff Pat Goggins ("Goggins") is a grower, breeder and livestock marketer from Billings, Montana. Gog-

gins objects to the use of his checkoff dollars to produce messages promoting all cattle rather than American cattle. Goggins is of the opinion that American produced cattle are superior to foreign produced cattle. Goggins objects to being compelled to pay for and promote foreign products. Goggins' auction business collects from producers and pays approximately $30,000 each year to the Board under the checkoff.

[¶ 8.] Plaintiff Johnnie Smith ("Smith") from Pierre, South Dakota, raises cattle and owns a partnership interest in a livestock market. Smith believes that the generic promotion of beef serves to promote imported beef. In fact, from September 11, 2001, to October 2001, foreign beef imports from Canada increased 26% while imports from Mexico increased 8%. Smith believes that foreign cattle are generally older with meat that is stringy and tough and that the foreign animals are more likely to have been subjected to pesticides. Smith opposes the use of his checkoff dollars to promote imported beef.

[¶ 9.] Herman Schumacher ("Schumacher") is a cattle producer from Herried, South Dakota. He also owns a livestock auction. He believes that generic advertising increases foreign imports which hurts his business. Foreign grown beef is in direct competition with his business. He objects to the use of his checkoff dollars for generic advertising of beef.

[¶ 10.] Plaintiff Jerry Goebel ("Goebel") is a cattle producer from Lebanon, South Dakota. Goebel objects to the use of checkoff funds for generic advertising which implies that beef is all the same.

[¶ 11.] Plaintiff Robert Thullner ("Thullner") is a cattle producer from Herried, South Dakota. Thullner objects to the generic messages paid for by checkoff dollars, which messages are contrary to his belief that only American beef should be promoted.

[¶ 12.] The parties spent considerable trial time trying to establish or attack the organizational standing of LMA and WORC. It was all much ado about nothing since it is clear that at least the foregoing five individual plaintiffs have standing to raise a *United Foods* First Amendment challenge to the beef checkoff. One plaintiff with standing is sufficient to confer jurisdiction over the claim and afford complete relief. Any claim of lack of standing should be rejected.

## II. Compelled Speech.

[¶ 13.] The United States Supreme Court has made it clear that "the freedom of an individual to associate for the purpose of advancing beliefs and ideas is protected by the First and Fourteenth Amendments." *Abood v. Detroit Board of Education*, 431 U.S. 209, 233, 97 S.Ct. 1782, 1798, 52 L.Ed.2d 261 (1977). *Abood* made it clear that the First Amendment protects not only the right to associate but also the right to refuse to associate.

[¶ 14.] The First Amendment does not necessarily prohibit Congress from compelling beef producers to associate for a common purpose. Indeed, the Supreme Court in *Abood* recognized that requiring public employees to help finance a union as a collective-bargaining agent "is constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress." *Abood*, 431 U.S. at 222, 97 S.Ct. at 1793. The Supreme Court has also held that compelled association by virtue of an integrated state bar is "justified by the State's interest in regulating the legal profession and improving the quality of legal services." *Keller v. State Bar of California*, 496 U.S. 1, 13, 110 S.Ct. 2228, 2236, 110 L.Ed.2d 1 (1990).

[¶ 15.] Like the plaintiffs in *Abood* and *Keller*, the plaintiff cattle producers

are compelled to associate. They are required by federal law, by virtue of their status as cattle producers who desire to sell cattle, to pay "dues," if you will, to an entity created by federal statute. Their status is not much different from that of attorneys who are required by statute to pay dues to a state bar association, which bar association is created by statute. The Act authorized the Secretary of Agriculture to promulgate the Beef Promotion and Research Order. The rules and regulations for collecting the checkoff assessments, for establishing the Board which Board decides how to spend the assessments collected, and the powers and duties of that Board are all statutorily mandated.

[¶ 16.] However, the use of compelled "dues" for advancing ideological causes objectionable to any member of the group violates the First Amendment. Compelling plaintiffs to make contributions for speech to which they object works an infringement of their constitutional rights. *Abood*, 431 U.S. at 234, 97 S.Ct. at 1799.

> If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.

*Abood*, 431 U.S. at 235, 97 S.Ct. at 1799 (quoting *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943)). The First Amendment protects not only the right to engage in or not engage in political speech but also any "expression about philosophical, social, artistic, economic, literary, or ethical matters." *Abood*, 431 U.S. at 231, 97 S.Ct. at 1797. *See also NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958) ("it is immaterial whether the beliefs sought to be advanced ... pertain to

political, economic, religious or cultural matters").

[¶ 17.] Three terms after the *Abood* decision the Supreme Court declared, in *Central Hudson Gas & Electric Corp. v. Public Service Comm'n of New York*, that the Constitution "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." 447 U.S. 557, 562, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980). The Supreme Court announced a four-part analysis in commercial speech cases which has become known as the *Central Hudson* test:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Central Hudson*, 447 U.S. at 566, 100 S.Ct. at 2351.

[¶ 18.] Applying the *Central Hudson* analysis, the United States Court of Appeals for the Third Circuit held:

> Although we find that the Beef Promotion Act implicates the first amendment rights of those obligated to participate, we hold that the government has enacted this legislation in furtherance of an ideologically neutral compelling state interest, and has drafted the Act in a way that infringes on the contributors' rights no more than is necessary to achieve the stated goal.

*United States v. Frame*, 885 F.2d 1119, 1137 (3rd Cir.1989). The Ninth Circuit reviewed the constitutionality of a similar generic advertising program for California

tree fruits in *Wileman Brothers & Elliott, Inc. v. Espy,* and, applying *Central Hudson,* reached a contrary conclusion:

> In sum, although we agree that the Secretary has a substantial interest in promoting peaches and nectarines, we hold that forced contributions to pay for generic advertising programs contravene the First Amendment rights of the handlers. The generic advertising programs neither "directly advance" the government's interest nor are they narrowly tailored. They therefore fail the second and third prongs of the *Central Hudson* test and violate the First Amendment.

*Wileman Brothers & Elliott, Inc. v. Espy,* 58 F.3d 1367, 1380 (9th Cir.1995). The United States Supreme Court granted certiorari in *Wileman* to resolve the conflict between *Frame* and *Wileman. Glickman v. Wileman Brothers & Elliott, Inc.,* 521 U.S. 457, 466–67, 117 S.Ct. 2130, 2137, 138 L.Ed.2d 585 (1997).

[¶ 19.] The Supreme Court in *Glickman* rejected the use of the *Central Hudson* test because that case involved a restriction on commercial speech rather than the compelled funding of speech involved in the California tree fruit marketing orders. *Glickman,* 521 U.S. at 474. n. 18, 117 S.Ct. at 2141 n. 18. A recent case, while admittedly dealing with the *Central Hudson* test, contains a statement indicating, if nothing else, the philosophical bent of the United States Supreme Court: "If the First Amendment means anything, it means that regulating speech must be a last—not first—resort. Yet it seems to have been the first strategy the Government thought to try." *Thompson v. Western States Medical Center,* —— U.S. ——, 122 S.Ct. 1497, 1507, 152 L.Ed.2d 563 (2002). This court makes the same observation in the context of the present case, namely that if the First Amendment means anything, it means that compelling speech must be the last and not the first

strategy considered by the government. *Glickman,* rather than using the *Central Hudson* test, applied *Abood'*s "germaneness" test, which the Supreme Court summarized as whether 1) the generic advertising in question "is unquestionably germane to the purposes" of the Act and 2) the assessments are not used to fund ideological activities. *Glickman,* 521 U.S. at 473, 117 S.Ct. at 2140. The Court held that the compelled contributions at issue were germane:

> Generic advertising is intended to stimulate consumer demand for an agricultural product in a regulated market. That purpose is legitimate and consistent with the regulatory goals of the overall statutory scheme ... In sum, what we are reviewing is a species of economic regulation that should enjoy the same strong presumption of validity that we accord to other policy judgments made by Congress. The mere fact that one or more producers "do not wish to foster" generic advertising of their product is not a sufficient reason for overriding the judgment of the majority of market participants, bureaucrats, and legislators who have concluded that such programs are beneficial.

*Glickman,* 521 U.S. at 476–77, 117 S.Ct. at 2141–42. The Court further concluded that the assessments were not used to fund ideological activities. *Glickman,* 521 U.S. at 473, 117 S.Ct. at 2140.

[¶ 20.] The Supreme Court in *Glickman* instructed that:

> ... *Abood* ... did not announce a broad First Amendment right not to be compelled to provide financial support for any organization that conducts expressive activities. Rather, *Abood* merely recognized a First Amendment interest in not being compelled to contribute to an organization whose expressive activities conflict with one's

"freedom of belief." ... Here, however, requiring respondents to pay the assessments cannot be said to engender any crisis of conscience. None of the advertising in this record promotes any particular message other than encouraging consumers to buy California tree fruit. Neither the fact that respondents may prefer to foster that message independently in order to promote and distinguish their own products, nor the fact that they think more or less money should be spent fostering it, makes this case comparable to those in which an objection rested on political or ideological disagreement with the content of the message ... our cases provide affirmative support for the proposition that assessments to fund a lawful program may sometimes be used to pay for speech over the objection of some members of the group.

*Glickman,* 521 U.S. at 471–73, 117 S.Ct. at 2139–40. In *Glickman,* the Court emphasized that, in determining whether the compelled assessments raised a First Amendment issue, it was important to consider the statutory context in which the compelled assessments arise:

California nectarines and peaches are marketed pursuant to detailed marketing orders that have displaced many aspects of independent business activity that characterize other portions of the economy in which competition is fully protected by the antitrust laws. The business entities that are compelled to fund the generic advertising at issue in this litigation do so as a part of a broader collective enterprise in which their freedom to act independently is already constrained by the regulatory scheme. It is in this context that we consider whether we should review the assessments used to fund collective advertising, together with other collective activities, under the standard appropriate for the review of economic regulation or under a heightened standard appropriate for the review of First Amendment issues.

*Glickman,* 521 U.S. at 469, 117 S.Ct. at 2138. It was the broad regulatory scheme, as we shall see, which was dispositive of the outcome in *Glickman.* Thus, the extent of the regulatory scheme in connection with the beef checkoff must be largely dispositive in this case.

[¶ 21.] Four terms after *Glickman,* the very same First Amendment claim was raised in *United States v. United Foods, Inc.,* 533 U.S. 405, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001). The statute in question in *United Foods* was the Mushroom Promotion, Research, and Consumer Information Act, 7 U.S.C. § 6101, *et seq.* The Mushroom Act mandated assessments upon handlers of fresh mushrooms to fund advertising for mushrooms. The assessment was similar to the beef checkoff in that the assessment is paid by producers and importers in an amount not to exceed one cent per pound of mushrooms. 7 U.S.C. § 6104(g). The Supreme Court distinguished *Glickman* because the compelled assessments for California tree fruits arose out of "a different regulatory scheme" which was fundamentally different in that the "mandated assessments for speech were ancillary to a more comprehensive program restricting marketing autonomy" while the advertising involved in the mushroom checkoff, "far from being ancillary, is the principal object of the regulatory scheme." *United Foods,* 533 U.S. at 411–12, 121 S.Ct. at 2338–39.

The California tree fruits were marketed "pursuant to detailed marketing orders that ha[d] displaced many aspects of independent business activity." [*Glickman,* 521 U.S.] at 469, 117 S.Ct. 2130, 138 L.Ed.2d 585. Indeed, the marketing orders "displaced competition" to such an extent that they were "expressly ex-

empted from the antitrust laws." *Id.*, at 461, 521 U.S. 457, 117 S.Ct. 2130, 138 L.Ed.2d 585. The market for the tree fruit regulated by the program was characterized by "[c]ollective action, rather than the aggregate consequences of independent competitive choices." *Ibid.* The producers of tree fruit who were compelled to contribute funds for use in cooperative advertising "d[id] so as a part of a broader collective enterprise in which their freedom to act independently [wa]s already constrained by the regulatory scheme." *Id.*, at 469, 521 U.S. 457, 117 S.Ct. 2130, 138 L.Ed.2d 585. The opinion and the analysis of the Court proceeded upon the premise that the producers were bound together and required by the statute to market their products according to cooperative rules. To that extent, their mandated participation in an advertising program with a particular message was the logical concomitant of a valid scheme of economic regulation.

The features of the marketing scheme found important in *Glickman* are not present in the case now before us ... almost all of the funds collected under the mandatory assessments are for one purpose: generic advertising. Beyond the collection and disbursement of advertising funds, there are no marketing orders that regulate how mushrooms may be produced and sold, no exemption from the antitrust laws, and nothing preventing individual producers from making their own marketing decisions. As the Court of Appeals recognized, there is no "heavy regulation through marketing orders" in the mushroom market. 197 F.3d at 225. Mushroom producers are not forced to associate as a group which makes cooperative decisions. "[T]he mushroom growing business ... is unregulated, except for the enforcement of a regional mushroom advertising program," and "the mushroom mar-

ket has not been collectivized, exempted from antitrust laws, subjected to a uniform price, or otherwise subsidized through price supports or restrictions on supply." *Id.*, at 222, 223.

*United Foods,* 533 U.S. at 412–13, 121 S.Ct. at 2339.

[¶ 22.] *United Foods* applied the rules of *Abood* and *Keller*: "objecting members [are] not required to give speech subsidies for matters not germane to the larger regulatory purpose which justified the required association." *United Foods,* 533 U.S. at 414, 121 S.Ct. at 2340. "We have not upheld compelled subsidies for speech in the context of a program where the principal object is speech itself." *United Foods,* 533 U.S. at 415, 121 S.Ct. at 2340. *United Foods* held that the compelled contributions for advertising mushrooms are not part of some broader regulatory scheme. *United Foods,* 533 U.S. at 415, 121 S.Ct. at 2340.

[¶ 23.] The Mushroom Promotion, Research, and Consumer Information Act, 7 U.S.C. § 6101, *et. seq.*, was identical in many respects to the Beef Promotion and Research Act, 7 U.S.C. § 2901, *et seq.* The Mushroom Act authorized the establishment of a

> coordinated program of promotion, research, and consumer and industry information designed to—(1) strengthen the mushroom industry's position in the marketplace; (2) maintain and expand existing markets and uses for mushrooms; and (3) develop new markets and uses for mushrooms.

7 U.S.C. § 6101(b). The Beef Act authorizes the establishment of a

> coordinated program of promotion and research designed to strengthen the beef industry's position in the marketplace and to maintain and expand domestic and foreign markets and uses for beef and beef products.

7 U.S.C. § 2901(b). The Mushroom Act authorized the Secretary to issue a Mushroom Order which mandated the establishment of a Mushroom Council and provided that each first handler of mushrooms, importer of mushrooms or any person marketing that person's own mushrooms must pay an assessment to the Mushroom Council. 7 U.S.C. §§ 6104(b) and 6104(g). The Beef Act authorizes the Secretary to issue a Beef Promotion and Research Order which mandates the establishment of a Cattlemen's Beef Promotion and Research Board and which order shall provide that producers of cattle and importers of cattle, beef, or beef products shall may an assessment to the Board. 7 U.S.C. §§ 2904(1) and 2904(8). The Mushroom Act authorized the Mushroom Council to use the assessments for "the implementation and carrying out of plans or projects of mushroom promotion, research, consumer information, or industry information". 7 U.S.C. § 6104(e). The Beef Act authorizes the Beef Board to use the assessments to "implement programs of promotion, research, consumer information, and industry information." 7 U.S.C. § 2904(6).

[¶ 24.] The beef checkoff is, in all material respects, identical to the mushroom checkoff: producers and importers are required to pay an assessment, which assessments are used by a federally established board or council to fund speech. Each sale of a head of cattle requires a one dollar payment as a checkoff. Thus, the beef checkoff is more intrusive, if you will, than was the case with the mushroom checkoff. The evidence presented to the court in this case was that at least 50% of the assessments collected and paid to the Beef Board are used for advertising. Only 10–12% of assessments collected and paid to the Beef Board are used for research. Clearly, the principal object of the beef checkoff program is the commercial speech itself. Beef producers and sellers are not in any way regulated to the extent that the California tree fruit industry is regulated. Beef producers and sellers make all marketing decisions; beef is not marketed pursuant to some statutory scheme requiring an anti-trust exemption. The assessments are not germane to a larger regulatory purpose. This case is therefore controlled by *United Foods* and not by *Glickman*.

[¶ 25.] The producer plaintiffs object to the payment of $1 per head of cattle for use in generically advertising beef. As set forth above in the discussion on standing, the plaintiffs believe that the generic advertising campaign increases the demand for cheaper foreign beef, to the detriment of plaintiffs. Plaintiffs also object to having to pay for the advertisement of steak, which is not the product that they sell. The plaintiff producers sell live cattle and the assessment is paid per head of live cattle. Restaurants, meat-packers, wholesale food outlets, and retail groceries sell beef and beef products. The plaintiffs object that they are required to pay for advertising for a product for which they do not receive the profit. These other entities receive the profits when there is an increase in demand for beef products. The objections of plaintiffs could be analogized to a wheat farmer being required to fund advertising for General Mills breakfast cereal.

[¶ 26.] The beef checkoff is unconstitutional in violation of the First Amendment because it requires plaintiffs to pay, in part, for speech to which the plaintiffs object. The Constitution requires that expenditures for advertising of beef be financed only from assessments paid by producers who do not object to advancing the generic sale of beef and who are not coerced into doing so against their wills. *Abood*, 431 U.S. at 236–237, 97 S.Ct. at 1800.

## II. Government Speech.

[¶ 27.] The defendants and intervenors argue that promotional materials paid for by the beef checkoff constitute government speech and are therefore not subject to a First Amendment challenge. The so called "government speech" doctrine is not so much a doctrine as it is an evolving concept that the government may compel the·use of coerced financial contributions for public purposes. The Supreme Court explained the doctrine in *Abood* without actually naming it:

Compelled support of a private association is fundamentally different from compelled support of government. Clearly, a local school board does not need to demonstrate a compelling state interest every time it spends a taxpayer's money in ways the taxpayer finds abhorrent. But the reason for permitting the government to compel the payment of taxes and to spend money on controversial projects is that the government is representative of the people. The same cannot be said of a union, which is representative only of one segment of the population, with certain common interests. The withholding of financial support is fully protected as speech in this context.

*Abood,* 431 U.S. at 259 n. 13, 97 S.Ct. at 1811 n. 13 (Powell, J., concurring).

[¶ 28.] The State of California sought to rely on the government speech doctrine in *Keller v. State Bar of California,* 496 U.S. 1, 10, 110 S.Ct. 2228, 2234, 110 L.Ed.2d 1 (1990). *Keller* held, however, that the State Bar of California was not a typical government agency because it

was created, not to participate in the general government of the State, but to provide specialized professional advice to those with the ultimate responsibility of governing the legal profession. Its members and officers are such not because they are citizens or voters, but

because they are lawyers. We think that these differences between the State Bar, on the one hand, and traditional government agencies and officials, on the other hand, render unavailing respondent's argument that it is not subject to the same constitutional rule with respect to the use of compulsory dues as are labor unions representing public and private employees.

*Keller,* 496 U.S. at 13, 110 S.Ct. at 2235.

[¶ 29.] *Keller* and other cases imply, in passing, that there is a "government speech" doctrine. It cannot be said, however, that the Supreme Court has given us an extensive discussion or explanation of the doctrine. In *Legal Services Corp. v. Velazquez,* 531 U.S. 533, 541–42, 121 S.Ct. 1043, 1048–49, 149 L.Ed.2d 63 (2001), the Supreme Court stated:

We have said that viewpoint-based funding decisions can be sustained in instances in which the government is itself the speaker, see *Board of Regents of Univ. of Wis. System v. Southworth,* 529 U.S. 217, 229, 235, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000), or instances, like *Rust,* in which the government "used private speakers to transmit specific information pertaining to its own program." *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).... The latitude which may exist for restrictions on speech where the government's own message is being delivered flows in part from our observation that, "[w]hen the government speaks, for instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy. If the citizenry objects, newly elected officials later could espouse some different or contrary position." *Board of Regents of Univ. of Wis. System v.*

*Southworth,* supra, at 235, 529 U.S. 217, 120 S.Ct. 1346, 146 L.Ed.2d 193.

[¶ 30.] One of the latest Supreme Court cases dealing with the First Amendment is *Ashcroft v. The Free Speech Coalition, et al.,* —— U.S. ——, 122 S.Ct. 1389, 1399, 152 L.Ed.2d 403 (2002): "As a general principle, the First Amendment bars the government from dictating what we see or read or speak or hear. The freedom of speech has its limits; it does not embrace certain categories of speech, including defamation, incitement, obscenity, and pornography produced with real children." The "laundry list", for what significance it may have, does not speak of "government speech."

[¶ 31.] The question here is essentially whether the government is the speaker or whether the government has instead permitted a private entity to promote its own program and agenda. Congress cannot legislatively extend the power to a private group to abridge First Amendment rights. *Abood,* 431 U.S. at 226 n. 23, 97 S.Ct. at 1795 n. 23 (*citing Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961)).

[¶ 32.] Is the Board, which receives the compelled checkoff assessments, akin to a labor union or state bar association whose members are representative of one segment of the population, thus preventing the Board from using checkoff assessments to fund speech of an ideological nature, or instead, is the Board more akin to a governmental agency, representative of the people, thus allowing the Board to use checkoff funds for speech that is relevant and appropriate to the Board's governmental interests? Defendants and intervenors contend that this issue is squarely answered by the Supreme Court's decision in *Lebron v. National Railroad Passenger Corporation,* 513 U.S. 374, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995). In *Lebron,* the Supreme Court held that,

where "the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment." *Lebron,* 513 U.S. at 400, 115 S.Ct. at 974–75. *Lebron* held that Amtrak was one such corporation.

[¶ 33.] The Third Circuit rejected the government's contention that the compelled expressive activities mandated by the Act constitute "government speech" in *United States v. Frame,* 885 F.2d 1119 (3rd Cir.1989).

> When the government allocates money from the general tax fund to controversial projects or expressive activities, the nexus between the message and the individual is attenuated. In contrast, where the government requires a publicly identified group to contribute to a fund earmarked for the dissemination of a particular message associated with that group, the government has directly focused its coercive power for expressive purposes.

*Frame,* 885 F.2d at 1132 (internal citations omitted).

> The Cattlemen's Board seems to be an entity "representative of one segment of the population with certain common interests." Members of the Cattlemen's Board and the Operating Committee, though appointed by the Secretary, are not government officials, but rather, individuals from the private sector. The pool of nominees from which the Secretary selects Board members, moreover, are determined by private beef industry organizations from the various states. Furthermore, the State organizations eligible to participate in Board nominations are those that "have a history of stability and permanency," and whose

"primary or overriding purpose is to promote the economic welfare of cattle producers." 7 U.S.C. § 2905(b)(3) & (4). Therefore, we believe that although the Secretary's extensive supervision passes muster under the non-delegation doctrine, it does not transform this self-help program for the beef industry into "government speech."

*Frame* 885 F.2d at 1133. The evidence presented to this court as to the makeup of the Board and the Operating Committee as well as the supervision by the Secretary is consistent with that set forth in *Frame.*

[¶ 34.] Defendant and intervenors contend that *Frame* is no longer valid in light of *Lebron.* *Lebron* could hardly be regarded as a "government speech" case. Amtrak was contending that it was not a governmental agency for the purposes of an artist's First Amendment challenge to the denial of his request to display an advertisement on an Amtrak billboard. The question in *Lebron* was not whether the speech was constitutional (because the government can use compelled contributions to pay for speech which is repugnant to some who contributed) but whether Amtrak could constitutionally prevent the artist's speech.

■ [¶ 35.] Of course, in evaluating whether the Beef Act's generic advertising scheme constitutes "government speech", one must take into account whether the speech comes from general tax revenues or instead from some forced assessments paid for by members of one group. "Since neither Congress nor the state legislatures can abridge (First Amendment) rights, they cannot grant the power to private groups to abridge them. As I read the First Amendment, it forbids any abridgment by government whether directly or indirectly." *Abood,* 431 U.S. at 227 n. 23, 97 S.Ct. at 1795 n. 23 (quoting *International Ass'n of Machinists v. Street,* 367 U.S. 740, 777, 81 S.Ct. 1784, 1804, 6 L.Ed.2d 1141 (1961) (concurring opinion)). The speech at issue here is not funded by any governmental general tax revenue. The assessments are collected from only one very narrow segment of society—cattle producers, importers, and others, all of whom sell cattle. That segment of society is not representative of the population in general. The speech funded by that group can be traced directly to that group.

[¶ 36.] I reject the contentions of defendants that the beef checkoff·is part of a regulatory scheme, akin to what exists with regard to California tree fruit. The regulatory scheme as to beef deals with meat safety, livestock auctions, and, at least allegedly, conduct by packers and stockyards. Cattle producers are not regulated on the farm or ranch or in marketing cattle. Cattle producers take what is offered to them by buyers and do not sell collectively.

[¶ 37.] As already discussed, the evidence received by the court in the trial of the First Amendment issue would support the findings by the district court and the Third Circuit in *Frame,* 885 F.2d at 1131–33. It is true that the Board, the entity which decides how to spend the mandated checkoff assessments, is created by statute to further the policy of the United States Congress to promote beef for the purpose of strengthening the beef industry's position in the marketplace. The Board is, however, comprised of private individuals who are not government employees. It is true that the Secretary must approve the appointment of those nominated to the Board. However, based upon the evidence, I conclude that such approval is merely *pro forma.* In fact, the Act itself only provides that the Secretary "certify" that those elected are in fact qualified. 7 U.S.C. § 2904(4)(A). It is true that all projects are submitted to the Secretary for final approval to spend checkoff funds for

the project. It is true that USDA employees attend every meeting of the Board, the Operating Committee, and the Executive Committee. However, Barry Carpenter, Deputy Administrator for the Livestock and Seed Division of the USDA Agricultural Marketing Service, admitted that USDA oversight is more akin to ministerial review of the Board's compliance with the Order.

[¶ 38.] Many millions of dollars have been spent these past several years on "producer communications". All of these so-called "producer communications," which were prepared with checkoff funds, stress to the producers that the Beef Board is a "producer-controlled, independent Board." They stress to the producers that the beef checkoff is an "industry run program," that "cattlemen run the program," that the Board is "accountable" to the producers, that the people who make the decisions are producers, that the program is producer run, producer led, producer controlled, and independent. Nowhere in any of the "producer communications" (which communications were apparently approved or at least not vetoed by the Secretary) does it even hint that the Board is accountable to the USDA or that the speech being paid for by the producers is that of the federal government.

[¶ 39.] All audits of the Board are done by a private auditing concern, not by the Office of Inspector General.

[¶ 40.] The Board's beef advertisements bear the copyright of the NCBA and the Board. They do not bear the distinctive notice from the Government Printing Office.

[¶ 41.] The Act provides that the Board, with the approval of the Secretary, may invest assessment funds "only in obligations of the United States or any agency thereof, in general obligations of any State or any political subdivision thereof, in any interest-bearing account or certificate of deposit of a bank that is a member of the Federal Reserve System, or in Obligations fully guaranteed as to principal and interest by the United States." 7 U.S.C. § 2904(9). These funds are not treated in the same manner as general tax funds. For the one year period ending September 30, 2001, (FY 2001) the Board earned interest income of $1,820,563.00. As of December 31, 2001, the Board's total investments amounted to $30,046,237.00.

[¶ 42.] The Third Circuit in *Frame* concluded that, despite the Secretary's "extensive" supervision of the checkoff program, "it does not transform this self-help program for the beef industry into 'government speech.'" *Frame*, 885 F.2d at 1133. I agree. The generic advertising program funded by the beef checkoff is not government speech and is therefore not excepted from First Amendment challenge.

[¶ 43.] Common sense tells us that the government is not "speaking" in encouraging consumers to eat beef. After all, is the "government message" therefore that consumers should eat no other product or at least reduce the consumption of other products such as pork, chicken, fish, or soy meal? The answer is obvious.

[¶ 44.] The Secretary approves Board contracts much like the Indian Gaming Commission does as to Indian casino contracts. Do the advertisements promoting gambling and entertainment then generated by Indian casinos or their management companies (operating under a contract approved by the Commission) then constitute "government speech"? Again, the answer is obvious.

[¶ 45.] The beef checkoff was used to pay $176,502.00 in FY 2000 and $169,988.00 in FY 2001 for "USDA Oversight." This is a further indication that what the Board has been doing is not government speech, the reason being that general tax revenues are not even being

used to oversee the checkoff program. Administration expenses of the Board in FY 2001 were $1,745,110.00. Total program expenses for FY 2001 were $51,409,950.00.

## III Relief.

 [¶ 46.] As in *Abood*, it would be impossible to separate what portion of any individual's checkoff assessment is related to the objectionable generic beef promotion activities and what portion is used for the unobjectionable research and educational activities. There is no authority for this court to allow any objecting producer to simply not pay the assessment. Such relief would, in essence, rewrite the Act so as to make it a voluntary assessment. This court may not and will not rewrite the Act. The only other relief available and authorized is to strike down those portions of the Act which authorize compelled assessments for generic promotional activities.

[¶ 47.] The court rejects the contentions of defendants that the court should, if relief is granted, limit the terms of this ruling to the contributions paid and to be paid by plaintiffs. To so limit the holding would only encourage numerous other producers, importers, and other sellers of beef on the hoof to file additional lawsuits in this and other federal jurisdictions.

 [¶ 48.] With a ruling that the entire Act and the Order violate the First Amendment, the defendants would be prohibited from using previously paid checkoff funds to continue operations, pay staff members, rent and other expenses, and otherwise operate under the terms of the Act and the Order to promote the purchase and consumption of beef and to fund or conduct research, i.e. until the money "runs out." Contracts for advertising have already been signed. It would be a virtual impossibility to attempt to refund illegally collected checkoff dollars to the beef producers and sellers. Costs to conduct the refund would be astronomical. Plaintiffs have not sought the refund of checkoffs paid in violation of the First Amendment. They have sought only the refund of checkoffs used in violation of the Act, i.e. to promote the checkoff itself and to oppose the referendum sought by plaintiffs. The court has already enjoined the use of beef checkoffs for such illegal purposes and does so again today by way of a permanent injunction. For all these reasons, the court determines that this ruling should be prospective only and should take effect only as of the start of business on July 15, 2002.

[¶ 49.] The court has earlier today discussed with counsel of record what the court intends to do. Defendants and the intervenors have orally and informally stated to the court and the other parties their desire to seek a stay of this injunction and declaratory ruling, this pursuant to Fed.R.App.P. § 8(a)(1). The court has informally advised the parties that the court would not be inclined to grant any such application for a stay. Therefore, it appears that moving for such a stay in the district court would be impracticable. The reasons are: (a) the ruling is prospective only; (b) the defendants will be allowed to continue to expend checkoff derived funds on hand and to be collected between now and July 15, 2002, to the extent that the uncommitted funds total more than $10,048,677.00; (c) the Board has at all times had a large surplus and such surplus can be used to continue advertising and research as the Board "winds down"; (d) if the defendants were to be allowed to continue to collect checkoffs under an unconstitutional law, cattle producers, many of whom are now under severe stress from drought conditions, unfavorable market conditions, and economic pressures forcing almost unprecedented sales of live cattle, including in many cases entire herds,

would be irreparably harmed since it would be extremely impractical, if not impossible, to refund, if the ruling of this court is not overturned by the United States Court of Appeals for the Eighth Circuit or the United States Supreme Court, any such future collections; (e) justice would not be served by a stay; and (f) the entire matter would only be further delayed if defendants were to be required to seek a stay in the district court with likely no chance of success before proceeding to the Court of Appeals.

[¶ 50.] The foregoing constitutes the court's findings of fact and conclusions of law.

[¶ 51.] The requested alternative relief as to the referendum and the Fifth Amendment claims should be denied on the basis that they are moot.

[¶ 52.] Remaining issues in this case include (a) the award of attorney fees, sales tax, and costs, and (b) the refund request as to $10,048.677.00 alleged to have been illegally expended on so-called "producer communications." A certification pursuant to Fed.R.Civ.P. § 54(b) is appropriate.

[¶ 53.] Portions of the preliminary injunction previously issued by the court should be made permanent.

### ORDER

[¶ 54.] Based upon the foregoing,

[¶ 55.] IT IS ORDERED, ADJUDGED AND DECREED as follows:

(1) The plaintiffs' request in the seventh cause of action of their third amended complaint for declaratory and injunctive relief is granted.

(2) The Beef Promotion and Research Act, 7 U.S.C. § 2901, *et seq.*, and the Beef Order promulgated thereunder, which mandate the payment of an assessment by cattle producers, importers, and others who sell beef subject to the terms of the Act (the beef checkoff), are unconstitutional and unenforceable because they violate the plaintiffs' rights under the First Amendment to the United States Constitution.

(3) The defendants and each of them as well as those described in Fed.R.Civ.P. § 65(d) are hereby enjoined and restrained from any further collection of beef checkoffs as of the start of business on July 15, 2002. This does not prohibit anyone from remitting on or after July 15, 2002, checkoffs collected before July 15, 2002.

(4) This ruling is prospective only as of July 15, 2002.

(5) There is no just reason for delay and, pursuant to Fed.R.Civ.P. § 54(b), judgment should be entered as provided herein although the judgment is as to fewer than all the claims or the rights and liabilities of the parties.

(6) Attorney fees, sales tax thereon, and the costs of this action shall be awarded to the plaintiffs.

(7) A stay, even if formally requested, would be denied for the reasons expressed in the opinion.

(8) The defendants and those described in Fed.R.Civ.P. § 65(d) are permanently enjoined and restrained from any further use of checkoff funds, directly or indirectly, for the purpose of lauding the merits of the checkoff program and from creating or distributing any material, whether written, oral, or audio-visual, for the purpose of influencing governmental action or policy with regard to the beef checkoff or the Board or both.